454 So.2d 468 (1984)
James R. STRINGER
v.
STATE of Mississippi.
No. 54580.
Supreme Court of Mississippi.
July 11, 1984.
As modified on Denial of Rehearing August 15, 1984.
*470 Harry L. Kelley, Jackson, for appellant.
Bill Allain, Atty. Gen. by Marvin L. White, Jr. and William S. Boyd, III, Sp. Asst. Attys. Gen., Jackson, for appellee.
Before the Court En Banc.
BOWLING, Justice, for the Court:
Appellant, James R. Stringer, was indicted, tried and convicted in the Circuit Court of the First Judicial District of Hinds County of the crime of capital murder. The bifurcated trial resulted in a jury verdict of guilty of the crime charged. The second phase of the trial resulted in a jury verdict sentencing appellant to suffer death according to the statutes provided therefor. The normal course of appeal brings the case here for full review according to statutory mandates. Appellant, through his appeal attorney[1] propounds assignments of errors as follows:
ASSIGNMENT OF ERROR NO. I.
The Court erred in allowing the District Attorney to cross examine the appellant about his unwillingness to submit to a lie detector test, over the objection of counsel and in admitting into evidence an agreement between the district attorney's office and the witnesses, Brock and Meddars to have their version of the events corroborated by a lie detector test, this admission into evidence although not objected to at the time is plain error under the rules of this Court.
ASSIGNMENT OF ERROR NO. II.
It was highly improper and prejudicial for the Trial Court to permit the state to question the defense witness, Tammy Williams, and the defendant, James Stringer, about what drugs they had used or were using and to allow into evidence against the defendant a weapon concealed in his boot at the time of his arrest which bore no relation to the crime.
ASSIGNMENT OF ERROR NO. III.
Appellant was deprived of effective assistance of counsel.
ASSIGNMENT OF ERROR NO. IV.
The Court erred in allowing the District Attorney to ask and elicit an answer from the defense witness, Tammy Williams, that she had been "charged" with conspiracy to commit murder and accessory after the fact.
ASSIGNMENT OF ERROR NO. V.
The appellant respectfully submits that this case should be reversed if for no other reason that that on the basis of the entire record, taking all errors and prejudicial matter into consideration, the defendant was deprived of a fair trial.
Prior to the appeal being perfected in the trial court, appellant, through his appeal attorney, filed a Petition for Writ of Error Coram Nobis. An evidentiary hearing was had thereon by the trial judge. The petition was denied and an appeal therefrom is included in the record now before us. We *471 first shall consider the merits of the conviction and sentencing case and thereafter shall discuss the appeal from the order denying coram nobis.
A careful study of the lengthy record in this cause shows acts of violence hard to be imagined by the average citizen. Mr. and Mrs. Ray McWilliams, residents of Jackson, Mississippi, were viciously and cold-bloodedly murdered in their home on the evening of June 21, 1982. The scene of the killings depicted actions of persons with no conscience toward their fellow man and absolutely no regard of human life. After being exposed to the events shown in the record in this cause, the writer of this opinion, having been exposed to knowledge of many acts of violence, readily understands why a majority of the United States Supreme Court has held and still holds that the death penalty with certain guidelines is constitutional. The case presented by the prosecution mainly relies on the evidence of two of the five persons who participated in the killing of Nell McWilliams, during the course of an attempted armed robbery of her husband, Ray McWilliams, who was also killed at the same time. These persons were Mike Meddars and Rhonda Brock. In addition to the testimony of the two accomplices there was certain corroborating evidence as shall hereinafter be discussed.
Meddars and Brock were dope-consuming and admittedly very unsavory people. They were acquainted with appellant and with one John Mack Parker. According to Meddars and Brock, during the day of June 21, they met at the apartment of one Tammy Williams, appellant's girlfriend, with whom he lived in an apartment complex in Jackson. The robbery and murder were planned during the course of the day. Appellant was in the business of buying and selling gold, silver and jewels. He owned a place of business in Jackson, which primarily was run by his son James.
Ray McWilliams was also in the business of buying and selling jewelry as an individual and operated from his home. Testimony in the record reveals that in connection with his business he kept considerable sums of money in a safe in his home. Appellant and Ray McWilliams had done business together in the past.
After riding around and closely inspecting the McWilliams' home, appellant and his cohorts, according to Meddars and Brock, again met in the Williams' apartment during the early part of the evening. That meeting was attended by appellant's twenty-year-old son James, who at his father's request, brought extra bullets and what is called a "riot" gun, which is a shotgun with a shortened barrel and handle.
After completing their plans, appellant, his son, John Mack Parker, Brock and Meddars left the Williams' apartment in Meddars' car with Meddars driving. According to Meddars and Brock, the plan was to stop the car in front of the McWilliams' home. Meddars, Parker and James Stringer were to remain hidden in the car, while appellant and Rhonda Brock went to the den door of the McWilliams' home, which door opened onto the driveway. Appellant and Brock were to call McWilliams to the door and request that they be permitted to come in for Brock to attempt to sell certain jewelry she had, as she needed some money immediately.
The plan worked until the entrance of the house by appellant and Brock. Appellant, according to Brock, immediately withdrew his .357 magnum revolver from its shoulder holster and ordered McWilliams to remain in the room. McWilliams was a large man. He started trying to take the pistol from appellant and soon after the ensuing scuffle started the pistol fired striking nothing but the wall. By that time, John Mack Parker had entered the premises followed by James Stringer and Meddars. According to Brock and Meddars, Parker placed his pistol to McWilliams head stating, "You are a dead man." Parker fired the gun and sure enough McWilliams became dead. According to Brock and Meddars Mrs. McWilliams was on the floor beginning to crawl, when James Stringer, Jr. placed the end of the *472 riot gun to the back of her head and pulled the trigger. This resulted in her skull and brains being scattered over the floor.
All five participants then left hurriedly. Parker was the driver of the car during the departure. Stringer was sitting on the passenger side of the front seat. The other three were in the backseat with Brock in the middle. These facts are emphasized along with other details primarily to show what the jury heard and what appears in the appellate record in the way of minute details of the entire incident as related by Meddars and Brock and corroborated in certain detailed instances. For instance, the first thing appellant said was in the form of a question as to whether or not Mr. and Mrs. McWilliams were killed. He received an affirmative answer from his son.
We digress here to relate that next door to the McWilliams home and in close proximity to it was the residence of a couple with two foster children. The wife testified that she heard the shots shortly after hearing voices. She went to the window and looked out and saw a car pulling away at a rapid rate of speed from the front of the McWilliams' home. Her testimony described the car with the same description shown in a photograph made of Meddars' car. The vehicle had a dark colored body with a light colored top. The witness was reasonably sure that the photograph depicted the same car she saw.
Resuming the testimony of the facts as related by Meddars and Brock, facts which this writer is afraid the ordinary layman cannot comprehend as happening, Meddars and Brock described in detail the plans set up and ordered by appellant to kill Mr. and Mrs. McWilliams as soon as they were under control. Simply stated, the intention was to cut their throats; this for two reasons  a Jackson city policeman lived immediately behind the McWilliams home and appellant was afraid that if shots were fired they would be heard by the policeman and appellant instructed the other participants that he was known by the McWilliamses and they had to be killed to prevent identification.
As the planned robbery and murders had their timing upset by McWilliams attempting to defend himself, the city policeman did hear the shots and was the first person to the scene after the participants had left in Meddars' car. He found the hereinabove described grisly and horrible situation planned and caused by appellant, according to the two participants who testified for the state.
According to Meddars and Brock, the five returned to the place of abode of appellant and his girlfriend, Tammy Williams. Appellant instructed Williams and Parker to take the guns, carried by each participant, and dispose of them. Appellant had made sure that each person was armed. As hereinbefore stated, appellant carried a .357 magnum pistol in a shoulder holster. Brock carried a .22 automatic pistol in her purse. Parker and Meddars each carried a .38 caliber pistol. The son James carried the riot gun. Parker disposed of the weapons, except for a .38 caliber pistol. Meddars testified that on the following day, June 22, he and Parker went to a lounge in Jackson, where he knew drugs were sold. The .38 caliber pistol was traded to the bar maid, who also testified, for five quaalude pills. Meddars understood that he was to come back later in the day and secure the pistol for money. Before he did so, the drug seller sold the pistol to an acquaintence for $60. After the events developed and publicity was released approximately two or three weeks later regarding the arrest of the participants in the killing, the person who had bought the pistol turned it into the police headquarters. The testimony was that any .38 caliber pistol that was fired in the McWilliams' home resulted in the bullet being so shattered that it could not be tested with the gun described above. According to Meddars, the .38 pistol was that carried by Parker.
The eventful story continues. Law enforcement officials were suspicious of appellant two days after the night the McWilliams were killed. Appellant was interrogated by officers and released. During the course of her testimony for the appellant, *473 Tammy Williams testified that on appellant's return from the police station, he told her that he had refused their request to take a lie detector test. This incident shall be discussed later under the assignments of error.
On the third day after the killing, appellant, Tammy Williams, Meddars and Brock went to Florida in two separate cars. They stayed two nights and returned. After the Florida trip, Meddars and Brock, along with other persons, called friends, went to Memphis, Tennessee, by way of Kosciusko, where Meddars was raised and his family still lived. After leaving Memphis, they returned to Kosciusko to the home of Meddars' brother. On the night of July 2, Brock became intoxicated. The record does not reveal the condition of Meddars. Regardless, the two became embroiled in an intense argument and altercation. This resulted in injuries to Brock, which included a black eye, although, according to Meddars, she received the black eye while he was trying to place her in his car. The altercation ended by Meddars placing Brock on the side of the road and leaving her. Brock, either because of vindictiveness, drunkenness or both, stopped at a house and called the Kosciusko police department. She was picked up and she gave those officials a statement about the McWilliams' killings, but in that statement she attempted to absolve herself. The next day Brock gave Jackson officials a statement in which she "told it all." All participants were promptly arrested. Meddars realized the side of the sticky butter he was in that held his bread together and confessed. Both agreed to plead guilty to manslaughter and testify in the present cause.
Appellant's defense was an alibi, which consisted of testimony from appellant, his son James, appellant's girlfriend Tammy Williams, James' girlfriend and two of their friends. They all testified that on the night in question, the latter four were in the apartment of James and his girlfriend and that they talked by telephone to appellant at the apartment where he "lived in". Obviously the jury did not believe the alibi defense.

ASSIGNMENT OF ERROR NO. I.
Appellant contends that it was reversible error to interject into the case appellant's unwillingness to submit to a lie detector test and admitting into evidence the written agreements of Meddars and Brock to take a test, which agreement was a part of the entire extensive written agreement between Meddars, Brock, their respective attorneys and the prosecution.
Both Meddars and Brock were represented by competent and experienced court-appointed trial attorneys. Prior to the testimony of each, these attorneys and the court clearly and without any doubt informed Brock and Meddars regarding any exposure they were submitting themselves to by testifying.
Meddars testified prior to the testimony of Brock. On cross examination of Meddars, appellant's attorney questioned the witness about any and all "deals" between the prosecution and the witnesses. This was readily and plainly explained by the witnesses. During re-direct examination by the state, the two-page, typed, single spaced agreement addressed to Meddars' attorney and signed by the district attorney, Meddars and his attorney on September 20, 1982, shortly before trial, was presented into evidence. The court on such presentation asked appellant's attorney "any objection?" The attorney replied, "No, Your Honor." This lengthy agreement was then introduced and toward the conclusion thereof is the almost unobserved statement that the agreement included verification of Meddars' testimony by polygraph examination.
After the testimony of Meddars and the introduction of his agreement, the state introduced the testimony of Brock. The state then offered the agreement of Brock, her attorney and the district attorney on the direct examination of Brock by the state. Upon the offering of this lengthy two-page typed, single spaced instrument, *474 appellant's attorney stated to the court "to which we have no objection, Your Honor."
As stated, both of these agreements were at the request of the attorneys for Meddars and Brock to insure that the state fully understood what these witnesses expected; that is a plea of guilty to manslaughter. The letter to each attorney from the district attorney, signed by all, including the witnesses, recited the status of the indictments of the witnesses and clearly spelled out that the final sentencing after the plea of guilty to manslaughter was within the sentencing authority of the trial judge and that no recommendation would be made by the state and other details to insure the veracity and testimony by Meddars and Brock. These agreements were the only testimony regarding the agreement between the two witnesses in question to take a polygraph examination. No discussion was had about the agreements. They were merely introduced in evidence.
As hereinbefore stated, not only did appellant's attorney not object to these agreements being introduced, he specifically stated he had no objection and agreed for their introduction. Appellant's attorney had prior knowledge of the agreements and had examined them. Anyone familiar with trial practice would recognize parts of the agreements that would be of strategic benefit to appellant.
Giving the appellant the benefit of the doubt, regarding the introduction of the agreements, had there been no announcement by appellant's attorney that he agreed for them to be introduced and had he merely sat silently, appellant would be barred for not having made a contemporaneous objection to the introduction of the agreements and thereby giving the trial court a chance to consider that issue. See Campbell v. State, 437 So.2d 3 (Miss. 1983); Pennington v. State, 437 So.2d 37 (Miss. 1983); Leatherwood v. State, 435 So.2d 645 (Miss. 1983); Tokman v. State, 435 So.2d 664 (Miss. 1983); Edwards v. Thigpen, 433 So.2d 906 (Miss. 1983); Hill v. State, 432 So.2d 427 (Miss. 1983); Wheat v. Thigpen, 431 So.2d 486 (Miss. 1983); and Bass v. Estelle, 696 F.2d 1154 (5th Cir.1983).
Another issue raised under Assignment No. I contends that it was reversible error for the court to have allowed the prosecution on cross examination of appellant to refer appellant to his girlfriend's testimony that he did not take a polygraph examination. Tammy Williams, the girlfriend, who according to Meddars and Brock, was a conspirator in the entire matter except for going to the McWilliams home, testified prior to appellant taking the stand. During her testimony, she related about appellant being called to the police station the second day after the killings and about her conversation with him when he returned. Upon her being asked what appellant said on his return, she replied, "and he said the police asked him to take a lie detector test" ... "he said he said he wouldn't."
On cross examination of appellant, he was questioned regarding his report to this girlfriend and about his statements regarding the polygraph examination. This evidence was objected to by appellant's attorney and the objection was overruled. Appellant contends that this action is reversible error.
In addition to the herein set out testimony of Tammy Williams, appellant's attorney on cross examination of witness Brock elicited from her that during Brock's conversation with appellant after the police station incident, appellant said, "he was asked to put on the lie detector test and he refused."
We therefore have two incidents where the refusal of appellant to take a polygraph examination was either injected into the case by appellant's attorney or by the state without objection. The refusal clearly was before the jury prior to any cross examination of appellant.
In addition to the injection of the fact that appellant refused to take a polygraph examination on two occasions prior to his taking the stand, it is our opinion that the mere mention of the failure to submit to such an examination could not be *475 reversible error under the record in this case. It was inconsequential in the case compared with all the other evidence placed before the jury. Further bolstering of this opinion is that we are not dealing with the attempted introduction of the results of a polygraph examination, only the refusal to take one for whatever reason including appellant's reasoning of its unreliability.

ASSIGNMENT OF ERROR NO. II.
Appellant complains of the questioning of him and his girlfriend, Tammy Williams, about taking drugs. His principal ground for this contention is that the use of drugs is a separate offense and cannot be considered in connection with the gruesome killings that we are dealing with here.
In the first place, by the time the alibi testimony of girlfriend Tammy Williams and appellant was reached, the record is full of drug use by all persons involved, including the taking of crystaline amphetamine by intravenous injection, smoking marijuana while drinking alcohol and other drugs. Meddars and Brock had testified extensively without objection about drug and alcohol use at the Williams/Stringer apartment at the time the crime was being planned. Certainly, any use of drugs by appellant and his girlfriend was material on the issue of their frame of mind. In fact, practical consideration requires the thought that it might help the participants in the proceedings had they been under the influence of drugs and not completely capable of realizing what they were doing. During all the testimony trying to establish an alibi, appellant's witnesses discussed the use of drugs during the very night they were talking by telephone so many times to each other. Even appellant, after contending that he used no drugs for three weeks prior to the killings, admitted that during that time he was attempting to recover from several months use of dilaudid, necessary to take because of an injury several months before, which crushed his hands, in an altercation with law enforcement officials in another county. The record is replete with the use of drugs by almost everyone. Even considering such fact, the jury could not have been prejudiced more than they were prejudiced against a defendant after hearing the direct, positive and startling testimony from the two participants in the killings. If anything, any influences of drugs would have the effect of tending to excuse the brutally and atrocious manner in which Mr. and Mrs. McWilliams met their death.
The writer is stressing this issue raised by appellant, even though it has no merit legally, in order to try and accomplish what criminal punishment statutes are designed to do; that is, to deter further crimes. Surely some unknowing citizens reading this opinion will realize what vicious people, even if drugs are included, are capable of doing to their fellow man.
Under this point appellant contends that it was error to divulge that when appellant was finally arrested approximately two weeks after the killings, a .38 caliber pistol was found in his boot. The record reveals that in planning the killings, appellant had a large number of weapons. He furnished weapons to Brock, Meddars and Parker. His son and appellant already had weapons. The weapons of Parker and Meddars were .38 caliber pistols. Mr. McWilliams was shot in the face with a .38 pistol. It was proper to ascertain how many .38's appellant owned. Furthermore, collection of this gun was a part of the circumstances surrounding appellant's arrest. There is no merit to this assignment of error.

ASSIGNMENT OF ERROR NO. III.
Under this assignment appellant advances a two-pronged attack on his trial attorney. He contends that his attorney's argument was not sufficient in the sentencing phase and that he was not diligent in securing other witnesses to present at the trial or in objecting to introduction of statements secured from the prosecution witnesses.
As already has been gathered, the principal attorney, who tried the complete bifurcated *476 case in the lower court, does not appear as attorney of record before this Court on appeal. We have carefully considered the many volumes of record relating to the trial procedures and evidence. Anyone either accustomed to studying records or with actual trial practice will readily state that the trial attorney did an excellent job and probably the best job possible. He was a hired attorney by appellant and not court-appointed.
This Court is fully acquainted with the experience, knowledge and reputation of appellant's trial attorney.
It does not take a lifetime of trial or judicial experience to know that competent trial attorneys are constantly making decisions regarding the strategy involved in representing their clients. It is interesting to note that there is no complaint about this attorney's argument on the guilt phase of the bifurcated trial. The record shows it to have been excellent. We now come to appellant's criticism of his attorney's argument in the sentencing phase. A mere reading of this argument readily shows the jury's attitude perception held by his attorney. The jury had just found his client guilty of capital murder. The attorney had no other witnesses. Therefore, the first question to himself was, "How do I make these twelve people react so that a death sentence will not come forth?" He made an obvious decision on strategy by first stating that he "still" was convinced of his client's innocence. Having this opinion still, he frankly admitted this to the jury and stated that in effect that he was confused as to arguing against the death sentence when he "still" believed him innocent. His plea to the jury was "I am in a position I really don't know how to handle." We are only reading cold words in the record. From experience we know that the attorney's demeanor and his attitude toward the jury played a great part in his decision to make that statement. He could not offend the jury. He could only try to instill a doubt in their minds. He did his best, but from studying all of the record in this case, his best was not enough to convince the jury.
Under this alleged assignment of error, the appeal attorney contends that the experienced trial attorney should have put on other witnesses without giving us one iota of information as to what type witnesses should have been introduced or their identity.
Appellant's appeal attorney further states that the ineffectiveness of the trial attorney is shown by his not objecting to lengthy statements given the officers by Meddars and Brock. This argument is without merit as it obviously was trial strategy as set out above. Any member of the judiciary or bar knows that a lengthy statement usually has at least a word or two in it that can be used to his advantage.
There are a number of cases on whether or not sufficient grounds are shown to reverse the jury verdict because the counsel for the accused was ineffective. In each case there have been discussions regarding strategy choices as discussed above. All cases have held that the accused is not entitled to errorless counsel, and not counsel judged ineffective by hindsight. Each case is to be decided on the totality of the facts of the entire record. See Baldwin v. Maggio, 704 F.2d 1325 (5th Cir.1983); Thomas v. Zant, 697 F.2d 977, (11th Cir.1983); Washington v. Estelle, 648 F.2d 278 (5th Cir.1981); Lovett v. State of Florida, 625 F.2d 706 (5th Cir.1980); United States v. Gray, 565 F.2d 881 (5th Cir.1978); and Herrin v. Estelle, 491 F.2d 125 (5th Cir.1974).
The guidelines for judicial determination of cases involving effective or ineffective assistance of counsel, primarily in death cases, have recently been set out clearly by the Supreme Court of the United States in the case of Strickland v. Washington, ___ U.S. ___, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). There the court reviewed an appeal from the Fifth Circuit. We have carefully studied that opinion and applied its mandates to the case sub judice. The court, speaking through Justice O'Connor, said:
A convicted defendant's claim that counsel's assistance was so defective as *477 to require reversal of a conviction or death sentence has two components. First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.
The Court, through Justice O'Connor further said:
These basic duties neither exhaustively define the obligations of counsel nor form a checklist for judicial evaluation of attorney performance. In any case presenting an ineffectiveness claim, the performance inquiry must be whether counsel's assistance was reasonable considering all the circumstances. Prevailing norms of practice as reflected in American Bar Association standards and the like, e.g. ABA Standards for Criminal Justice 4-1.1 to 4-8.6 (2d ed. 1980) ("The Defense Function"), are guides to determining what is reasonable, but they are only guides. No particular set of detailed rules for counsel's conduct can satisfactorily take account of the variety of circumstances faced by defense counsel or the range of legitimate decisions regarding how best to represent a criminal defendant. Any such set of rules would interfere with the constitutionally protected independence of counsel and restrict the wide latitude counsel must have in making tactical decisions. See United States v. Decoster, 624 F.2d [196] at 208. Indeed, the existence of detailed guidelines for representation could distract counsel from the overriding mission of vigorous advocacy of the defendant's cause. Moreover, the purpose of the effective assistance guarantee of the Sixth Amendment is not to improve the quality of legal representation, although that is a goal of considerable importance to the legal system. The purpose is simply to ensure that criminal defendants receive a fair trial.
Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. Cf. Engle v. Isaac, 456 U.S. 107, 133-134 [102 S.Ct. 1558, 1573-1575, 71 L.Ed.2d 783] (1982). A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action "might be considered sound trial strategy." See Michel v. New York, Supra, [350 U.S. 91] at 101 [76 S.Ct. 158 at 164, 100 L.Ed. 83]. There are countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way. See Goodpaster, The Trial for Life: Effective Assistance of Counsel in Death Penalty Cases, 58 N.Y.U.L.Rev. 299, 343 (1983).
We heretofore have discussed the specific reasons advanced by appellant as to why his personally hired attorney did not render effective assistance of counsel. We find that appellant's contention does not in any way satisfy the requirements of Strickland, supra, that could result in a *478 reversal of the cause under this assignment of error. The conduct of the trial by appellant's attorneys meets every requirement of Strickland; as hereinbefore stated the record reveals a well tried case. There is no indication that any contentions of fault by the trial attorneys were anything other than trial strategy.
We find further as required in Strickland that the defendant received a fair trial. He chose a competent and reputable trial attorney with much experience in defending criminal cases. He now makes no meaningful contention that his attorney's performance was deficient. We find no merit under Assignment of Error No. III. We find as a fact that appellant's employed trial attorney was competent, experienced and effective as possible.

ASSIGNMENT OF ERROR NO. IV.
Appellant claims reversible error by the trial court in permitting appellant's girlfriend Tammy Williams to be asked if she was charged with a crime as a result of the killings of Mr. and Mrs. McWilliams. In the first place, this information already was before the jury. As the court was required to do, when Mrs. Williams took the stand to be an alibi witness, she was warned by the court that "Ms. Williams I understand that you have been indicted and I want to advise you that under the Fifth Amendment of the United States Constitution and the Constitution of Mississippi that you do not have to make any statement that will incriminate you. Do you understand this?" The witness answered, "Yes, sir." During her testimony she was asked what she was charged with doing. This clearly was permissible to show her interest in the case being tried. She certainly had a big personal interest as to whether or not appellant would be convicted. Furthermore, the record was replete with testimony regarding Ms. Williams' involvement in the occurrence. There is no merit to this assignment of error.

ASSIGNMENT OF ERROR NO. V.
There is no merit to the catch-all contention that the record shows an injustice committed and is against the evidence. A large part of that evidence heretofore has been discussed. There is much more that space does not require. It is sufficient to say that a study of the record in the cause reveals an abundance of evidence for the jury to have found that appellant was guilty of capital murder.

SENTENCING PHASE
As statutorily demanded, we have considered all the assignments of error and have carefully considered any possible assignments of error that were not propounded. Furthermore, we have carefully considered the punishment as required by statute. We first are required to consider whether the sentence of death was imposed under the influence of passion, prejudice or any other arbitrary factor. We hold without hesitation that a study of the record could not reveal evidence stronger for a jury to consider and impose a death penalty without being influenced by passion, prejudice or any other arbitrary factor. The clear and detailed testimony of two of the participants has shown in this record was of such magnitude that it would be hard to construct a case where the sentence of death would be more appropriate under the constitutional guidelines as set out in all applicable authorities. In reviewing the sentence of death, we fully have considered the fact that the evidence does not reveal that appellant actually pulled the trigger of a weapon that killed Mrs. McWilliams. There is an abundance of evidence, however, that it was appellant who instigated and planned all of the activities that culminated in the killing. He was the one who furnished the weapons used. He was the one who laid out the detailed plans for the other four participants to follow. He was the first one in the McWilliams' home and the first one pulling a weapon and ordered Mr. McWilliams to abide by his directions. The pistol in his hand was fired before any other weapon. It was fired at a time when *479 McWilliams was trying to take the weapon from appellant. The testimony revealed a wound in the hand of Mr. McWilliams. This wound, according to the expert pathologist, was made while Mr. McWilliams was attempting to defend himself. Appellant according to abundant evidence, made his first point after the killing to ascertain if both Mr. and Mrs. McWilliams were actually dead. He was the instigator, the planner, the master-mind and the one who directed the entire occurrence. According to the testimony of the two participants, the attempted armed robbery and the killing would not have occurred had it not been for appellant.
He actually ordered that the McWilliamses be killed, even if the underlying felony, the armed robbery, had been successful. The McWilliamses would not have been killed, according to this record, had the murder not been ordered by appellant. We, therefore, find without hesitation that the affirmance of appellant's death penalty is proper, even though he did not actually pull the trigger of the weapon that caused the death. This conclusion is supported fully by the United States Supreme Court in its opinion in Enmund v. Florida, 458 U.S. 782, 102 S.Ct. 3368, 73 L.Ed.2d 1140 (1982).
We further find that as required by statute, the evidence fully supports the jury's finding of statutorily required aggravating circumstances.
We have considered prior cases of this court including those either affirmed or reversed, and find that the sentence of death in the present case is not excessive or disproportionate to the penalty imposed in similar cases considering both the crime and the appellant. A true and correct copy of the cases considered is attached hereto and marked Exhibit "A" to this opinion.
We find no reversible error in either the guilt or sentence phase of the bifurcated trial. We affirm the resulting judgment of the lower court that appellant is guilty of capital murder and also affirm the judgment sentencing appellant to death to be carried out according to law.
AFFIRMED AS TO GUILT AND SENTENCE.
PATTERSON, C.J., WALKER and ROY NOBLE LEE, P. JJ., and HAWKINS, PRATHER, ROBERTSON and SULLIVAN, JJ., concur.
DAN M. LEE, J., concurs in result only.

APPEAL OF DENIAL OF PETITION FOR WRIT OF ERROR CORAM NOBIS
Within the proper time framework post-trial, appellant discharged his trial attorneys and employed another well-known, competent and experienced criminal defense attorney. This attorney filed a petition for writ of error coram nobis alleging that witness Walter Owens, III had given him a stenographically transcribed sworn statement that he was coerced into giving certain testimony at the trial during the state's presentation of evidence. The petition charged that Owens admitted to the post-trial attorney that his testimony was untrue because of threats made by a representative from the office of the district attorney.
A brief review of Owens' testimony reveals that he was a "cell mate", in a cell including a number of persons, prior to appellant's trial. Owens had been convicted by a jury of manslaughter, sentenced and was waiting the process of appeal. His testimony was to the effect that during conversations with appellant, that on being questioned as to what occurred, appellant in effect stated that "it's just a long, drawn-out story and I don't want to talk about it." Appellant further stated in the conversation, "I knew what was going on." Appellant also told him, according to Owens, "He knew who was involved." Owens had previously given a written statement confirming what his testimony would be.
The trial judge set an immediate hearing on appellant's petition. Appellant's new attorney called all law enforcement and *480 prosecuting personnel involved and there was absolutely no evidence of any pressure applied to Owens to get his statement. Owens did not show up for the hearing and had to be secured by his personal attorney. On being placed on the stand, Owens refused to answer any questions under his constitutional guarantee against self-incrimination.
We therefore have only a copy of his alleged affidavit given post-trial. It is readily noted in the affidavit that appears in the record that Owens still said in the affidavit that appellant told him in the cell that "he knew what was going on," and that "he knew about some jewelry and stuff we could get rid of easy." In effect and as found by the trial court, there was in reality no large variance between the testimony given by Owens and that appearing in his affidavit. It should be noted that the affidavit was not introduced, but only attached to the petition. Owens made no verification of the affidavit.
Although the petition for writ of error coram nobis filed below and testimony taken thereon set out as the sole ground that the testimony of Owens was secured by unlawful means, appellant assigns as error here, on appealing the trial court's denial of the writ, two grounds; namely, (1) the court erred in allowing the witness Walter Owens, III to invoke the Fifth Amendment and (2) the court erred in not allowing defense counsel to amend his petition to include the destruction of the tape.
Appellant cites no authority whatever under his first point. For this action, we could dispose of the issue for this reason under Wood v. Gulf States Capital Corp., 217 So.2d 257 (Miss. 1969); and Dozier v. State, 247 Miss. 850, 157 So.2d 798 (1963).
We hold, however, that the record clearly reveals that Owens had the constitutional right to invoke the provisions of the Fifth Amendment to the United States Constitution, taking into consideration any rights the appellant might have under the Sixth Amendment. See United States v. Goodwin, 625 F.2d 693 (5th Cir.1980); United States v. Lacouture, 495 F.2d 1237 (5th Cir.1974); United States v. Gloria, 494 F.2d 477 (5th Cir.1974) and Hoffman v. United States, 341 U.S. 479, 71 S.Ct. 814, 96 L.Ed. 1118 (1951).
At the hearing on the petition an investigator from the district attorney's office testified that in addition to the written statement introduced in evidence by Owens at the trial, a taped statement had been taken at the same time. Since the statements were taken, the tape had been used in other investigations and the statement of Owens had been "used over." It was explained fully and carefully why there was no reason to keep the tape after the written and signed statement from Owens pertaining to his knowledge was taken and signed.
After the hearing was over and after the trial judge had rendered his opinion denying the petition, appellant's new attorney requested that he be allowed to amend his petition to allege that the tape had been destroyed. A formal amendment was denied at that point. The record of the hearing on the petition, clearly shows that the situation regarding the destruction of the tape was brought out as fully as possible. The court took that into consideration and so do we. A formal amendment was not necessary. The facts surrounding the destruction of the tape were fully considered by the lower court and are fully considered by this Court. The question of whether or not at the point when everything was over, there should have been a formal amendment to the original petition has no merit. Such formal semantics would have been useless. Appellant's argument seems to be confined to the fact that the tape was not produced at the hearing. As stated before, this argument cannot have any possible merit as everyone testified and everyone admitted that the tape was destroyed and its admission was impossible.
Appellant's attorney in his experience and wisdom did not argue in his brief the alleged assignment of error regarding his requested amendment. His argument went to the admitted fact that the tape had *481 been re-used and only Owens' written statement was available. We could dispose of the contention for that reason alone, but do not do so. See Woods v. Gulf States Capital Corp., supra, and Dozier v. State, supra.
We find that there is no merit to appellant's contention on appeal requesting a reversal of the lower court's denial of its petition for writ of error coram nobis and that act is affirmed.
Having affirmed the guilt and sentencing phase of appellant's trial and judgments thereon, appellant's execution by law is directed to be carried out on Tuesday, August 7, 1984.
AFFIRMED.
PATTERSON, C.J., WALKER and ROY NOBLE LEE, P. JJ., and HAWKINS, PRATHER and ROBERTSON and SULLIVAN, JJ., concur.
DAN M. LEE, J., concurs in result only.

APPENDIX "A"
DEATH PENALTY CASES AFFIRMED BY THIS COURT:

Dufour v. State, 453 So.2d 337 (Miss. 1984).

Billiot v. State, 454 So.2d 445 (Miss. 1984).

Neal v. State, 451 So.2d 743 (Miss. 1984).

Booker v. State, 449 So.2d 209 (Miss. 1984).

Wilcher v. State, 448 So.2d 927 (Miss. 1984).

Caldwell v. State, 443 So.2d 806 (Miss. 1983).

Irving v. State, 441 So.2d 846 (Miss. 1983), and 361 So.2d 1360 (Miss. 1978).

Tokman v. State, 435 So.2d 664 (Miss. 1983).

Leatherwood v. State, 435 So.2d 645 (Miss. 1983).

Hill v. State, 432 So.2d 427 (Miss. 1983).

Pruett v. State, 431 So.2d 1101 (Miss. 1983).

Gilliard v. State, 428 So.2d 576 (Miss. 1983).

Evans v. State, 422 So.2d 737 (Miss. 1982).

King v. State, 421 So.2d 1009 (Miss. 1982).

Wheat v. State, 420 So.2d 229 (Miss. 1982).

Smith v. State, 419 So.2d 563 (Miss. 1982).

Edwards v. State, 413 So.2d 1007 (Miss. 1982).

Johnson v. State, 416 So.2d 383 (Miss. 1982).

Bullock v. State, 391 So.2d 601 (Miss. 1980).

Reddix v. State, 381 So.2d 999 (Miss. 1980).

Jones v. State, 381 So.2d 983 (Miss. 1980).

Culberson v. State, 379 So.2d 499 (Miss. 1979).

Gray v. State, 375 So.2d 994 (Miss. 1979).

Jordan v. State, 365 So.2d 1198 (Miss. 1978).

Voyles v. State, 362 So.2d 1236 (Miss. 1978).

Washington v. State, 361 So.2d 61 (Miss. 1978).

Bell v. State, 360 So.2d 1206 (Miss. 1978).
DEATH PENALTY CASES REVERSED AS TO PUNISHMENT AND REMANDED FOR RESENTENCING TO LIFE IMPRISONMENT:

Dycus v. State, 440 So.2d 246 (Miss. 1983).

Edwards v. State, 441 So.2d 84 (Miss. 1983).

Coleman v. State, 378 So.2d 640 (Miss. 1979).
DEATH PENALTY CASES REVERSED AS TO PUNISHMENT AND REMANDED FOR A NEW TRIAL ON SENTENCING PHASE ONLY:

Cannaday v. State, 455 So.2d 713 (1984).

Williams v. State, 445 So.2d 798 (Miss. 1984).

Wiley v. State, 449 So.2d 756 (Miss. 1984).
NOTES
[1] The entire bifurcated trial was handled by other attorneys as shall hereinafter be discussed.