# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2019-CA-00282-COA

### CONSOLIDATED WITH

## NO. 2012-KA-00258-SCT

LISA SANDLIN A/K/A LISA A. SANDLIN A/K/A          APPELLANT
LISA BABLER A/K/A LISA HUSKY

v.

STATE OF MISSISSIPPI                                       APPELLEE

| | |
|---|---|
| DATE OF JUDGMENT: | 03/20/2019 |
| TRIAL JUDGE: | HON. PAUL S. FUNDERBURK |
| COURT FROM WHICH APPEALED: | LEE COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | MERRILL K. NORDSTROM |
| | LAWRENCE JOHN TUCKER JR. |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: LISA L. BLOUNT |
| NATURE OF THE CASE: | CIVIL - POST-CONVICTION RELIEF |
| DISPOSITION: | AFFIRMED - 08/25/2020 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**EN BANC.**

**LAWRENCE, J., FOR THE COURT:**

¶1. On February 1, 2011, Lisa Sandlin was indicted for murdering her stepson, Kirk Sandlin. She was convicted by a jury in Lee County Circuit Court on December 1, 2011 and subsequently sentenced to life in prison. On February 8, 2012, Lisa appealed her conviction which was affirmed by the Mississippi Supreme Court on October 10, 2013, in *Sandlin v. State*, 156 So. 3d 813 (Miss. 2013). On June 5, 2015, Lisa filed an application for leave to proceed in the trial court on a post-conviction relief (PCR) motion with the Mississippi

Supreme Court, alleging seven issues. On November 4, 2015, the Mississippi Supreme Court granted her motion as to three of the seven issues alleged. On January 20, 2016, Lisa filed a PCR motion in the Lee County Circuit Court on the three authorized issues including: (1) ineffective assistance of counsel in failing to object to the district attorney calling her husband, Sammy Sandlin, as a witness, (2) ineffective assistance of counsel for objecting to the state's attempt to include self-defense in the elements instructions and (3) cumulative errors denied her constitutional rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments. An evidentiary hearing was held on March 27, 2017, and her PCR was denied on March 20, 2019. Lisa appealed.

## FACTS AND PROCEDURAL HISTORY

¶2. Lisa and her husband Sammy lived in Saltillo, Mississippi in Lee County with Sammy's mother, Mary Sandlin (Mammie).[1] Both Lisa and Sammy had children from previous marriages. Lisa had one son, Jesse Husky,[2] and Sammy had one son, Kirk Sandlin. Kirk lived alone in his grandmother's house, down the hill from Sammy and Lisa's home on the same parcel of family land. On September 22, 2010, Lisa and Mammie were sitting in their backyard around a fire after dinner. Kirk walked up from his house to Sammy and Lisa's backyard and began talking to Mammie. During that conversation, Lisa and Kirk got into a heated verbal altercation wherein Lisa ultimately went inside the house to remove herself from the situation. While Lisa was inside, Sammy returned home and stayed outside

---

[1] Mary Sandlin suffered from Alzheimer's disease and was no longer capable of unassisted living.

[2] Jesse has reached the age of majority and his legal name will be used in this opinion.

2

to speak to Kirk. Lisa went back outside to the backyard where Sammy and Kirk were talking and she and Kirk resumed their argument. The situation began to escalate when Lisa moved into the breeze-way patio between the house and the garage and Kirk followed her, pushed her in the chest and spit at her. Trying to keep the peace, Sammy told Lisa to go inside the house and told Kirk to leave the home. Lisa went inside and proceeded to retrieved Sammy's shotgun from their bedroom closet. Kirk initially began walking back to his house; however, he turned around and returned to Sammy and Lisa's breezeway to talk to Sammy. As Kirk headed back to the breeze-way, he saw Lisa standing at the door with Sammy's gun. Kirk said, "[w]hat are you going to do with that, crazy bitch? Shoot me?" Lisa stated that she would shoot him if necessary and Kirk replied "go ahead." The shotgun fired once, and Kirk died as a result of the shotgun wound to his abdomen.

¶3. Officer Kerry Gaddy of the Lee County Sheriff's Department was the first law enforcement officer on the scene. Upon learning that Lisa was still inside the home, Officer Gaddy entered the home and called for Lisa to come out. Lisa emerged from the home and, stated, "I shot the m***f***. I was tired of his s***." According to Gaddy, Lisa did not state that she had been threatened or that the shooting was an accident or in her own self-defense. According to Officer Gaddy, Lisa seemed agitated and upset but not frightened. Officer Jason Putt arrived at the residence and placed Lisa under arrest and read her the *Miranda* rights.[3] Once Lisa was placed in the patrol car, she made a similar statement to Investigator Scotty Reedy and said that she was tired of Kirk's s*** and shot him. Lisa also told Officer

---

[3] *Miranda v. Arizona*, 384 U.S. 436 (1966),

3

Reedy that there had been no physical altercation, just a verbal one. Lisa admitted to Reedy that she had shot Kirk, but she claimed that the gun had gone off by accident. During a subsequent interview with Reedy on September 23, 2010, Lisa added facts to her initial statement and told him that Kirk had run toward her before she shot him. In that Interview, she also told him about previous domestic-violence reports that she had previously filed against Kirk. Lisa was indicted for Kirk's murder on February 1, 2011.

**The Original Trial**

¶4. Lisa was represented by Christopher Bauer at trial, during which he argued an "accident" based defense on Lisa's behalf. Lisa, through her attorney, argued throughout the entire trial process that the shooting of Kirk was accidental and that she was not aware that the gun was loaded.

¶5. The State called seven witnesses at the original trial including: Investigatory Scotty Reedy, Officer Kerry Gaddy, Officer Jason Putt, John Sandlin, Sammy Sandlin, Dr. Amy R. McMaster, and Lisa Robinson. The defense called two witnesses at the original trial including: Lisa Sandlin and Jesse Huskey. Investigator Reedy, Officer Gaddy and Officer Putt all testified to their participation in the initial investigation of Kirk's death. They testified to statements that Lisa made to each of them respectively as stated above, their observations of the crime scene and their respective duties in securing the crime scene and taking Lisa into custody. Sammy's brother John testified at the trial to events that transpired on the day before Kirk's death wherein Lisa yelled at him and Kirk, "If ya'll don't get the hell out from here, I'm fixing to start shooting." He testified that Lisa's statement was

4

unprovoked. Dr. Amy R. McMaster is the forensic pathologist who performed Kirk's autopsy. She testified as to the results of the autopsy and the cause of Kirk's death being shotgun wound to the torso by manner of homicide. Lisa Robinson was a detention officer that worked at the facility where Lisa was housed. Lisa Robinson was called by the State to testify to a certain incident that occurred at the facility involving Lisa. The defense made a relevancy objection which was sustained by the trial court and Lisa did not testify any further. Other than Lisa, the only other witness that the defense called at trial was Lisa's son, Jesse Huskey. Jesse testified as to Kirk's character as he knew him growing up and Kirk's tumultuous relationship with Lisa.

¶6. Most relevant to this appeal, the State called Lisa's husband, Sammy, during its case-in-chief with no objection from Lisa's attorney to testify, as the only reliable eye-witness to the events that transpired on the night Kirk was shot.[4] Ultimately, Sammy proved helpful to both the State and the defense. Sammy was helpful to the defense in that he testified to the following: (1) he did not think that Lisa wanted to kill Kirk, (2) Lisa worked hard in helping him with his business, (3) Lisa and Kirk had a good healthy relationship at the beginning of their marriage, (4) he never knew Lisa to touch the shotgun, (5) he was the owner of the gun and he was the last person to use the gun, (6) further, that it was his practice to keep the gun unloaded in the house but he could not be certain if he unloaded it before he put it back in the closet, and (7) Kirk had a drug problem, criminal history, and propensity to steal from

---

[4] Sammy's mother, Mary Sandlin was present and a witness to the events leading up to Kirk's death; however, she suffered from Alzheimer's disease and could not be considered a reliable witness for that reason.

5

him.  Conversely, Sammy made several statements in Lisa's bond hearing and in his statement to the investigators that were brought up at trial and  proved helpful for the State as follows: (1) "Anyone who would shoot somebody like that would either be evil or crazy," (2) When referring to the shooting, Sammy made the statement, "it might be me next time," and (3) "Lisa has talked about shooting Kirk for a long time."

¶7.     At the close of the trial, Lisa's attorney objected to the State's request to include "not in necessary self-defense" in the elements instruction because it did not coincide with their defense strategy.  Defense counsel argued that there was no testimony presented at trial that could substantiate a self-defense language.  As a result of that objection, the trial court removed the self-defense language from the elements instruction.  On December 11, 2011, Lisa was convicted by a jury on the charge of first-degree murder.  Lisa directly appealed her conviction which was affirmed by the Mississippi Supreme Court in *Sandlin v. State*, 156 So. 3d 813 (Miss. 2013).

¶8.     On June 5, 2015, Lisa filed an application for leave to proceed in the trial court on a PCR motion with the Mississippi Supreme Court, alleging seven issues. On November 4, 2015, the Mississippi Supreme Court granted her motion as to three of the seven issues alleged.  On January 20, 2016, Lisa filed a motion for post-conviction relief (PCR) in the Lee County Circuit Court on those three issues   An evidentiary hearing was held on March 27, 2017 in Lee County Circuit Court on Lisa's PCR motion wherein only Lisa and her attorney, Bauer, testified.

**The Evidentiary Hearing**

6

¶9.    Lisa testified that she recalled speaking to Bauer about the possibility of Sammy testifying only once, about eight months after Kirk was shot. She testified that Bauer told her that Sammy was going to be a witness for the State, but that he was going to "check the legality of it" and re-approach her with the issue. According to Lisa, Bauer never again mentioned the possibility of Sammy testifying against her. She also maintained that Bauer never told her that, had they objected at trial, Sammy could have been prevented from testifying. Lisa claimed that, had she known she could have prevented Sammy testifying for the State, she would have. Further, Lisa testified that she and Bauer had never reviewed jury instructions together and more specifically a self-defense instruction. She also testified that Bauer never explained to her the likely outcomes or ramifications of raising an accident defense versus a self-defense defense. Lisa alleges that Bauer's failure to object to Sammy testifying for the state based on spousal privilege constitutes ineffective assistance of counsel. Further, Lisa alleges that Bauer's objection to the State's request for a self-defense instruction on her behalf constitutes ineffective assistance of counsel. Finally, Lisa asserts that the alleged cumulative errors constitutes a denial of her constitutional rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments.

¶10.    Bauer testified at the PCR evidentiary hearing. He testified that he and Lisa began talking about Sammy's testimony very "early" in the pre-trial process and that he made Lisa aware that they could prevent Sammy from testifying on the basis of spousal privilege. Bauer stated that he and Lisa spoke about it at the Lee County jail "extensively," and that he, Sammy, and Lisa discussed it together on another occasion at the Lee County courthouse.

7

Further, Bauer testified that the decision to rely on an accident defense was "made by Ms. Sandlin" after she and Bauer discussed her case "thoroughly." Bauer testified that he and Lisa discussed her defense extensively and that he had originally attempted to convince Lisa to argue self-defense. According to Bauer, it was ultimately Lisa who made the decision to utilize an accident defense against his advice. It was Bauer's contention that his objections to the self-defense jury instructions were based on his belief that they were contrary to the defense that Lisa maintained from the beginning of trial. Bauer testified that it was his belief that it would have been confusing to the jury to bring up self-defense in the jury instructions when it was never an argument that was made by the defense during trial. Finally, Bauer testified that his decision to allow Sammy to testify and his decision to object to the self-defense language in the elements instruction were decisions that were made as a part of his trial strategy and which he formulated with Lisa's input. It was Bauer's testimony that Lisa was the ultimate decision maker in the handling of her case which led to the decisions he made at trial.

¶11.  After conducting an evidentiary hearing and "considering the totality of the entire record," the trial court found that Lisa failed to overcome the "strong presumption that under the circumstances, the challenged actions of her trial counsel might be considered trial strategy." In its order denying petitioner Lisa Sandlin's motion for post-conviction relief, the trial court stated, "This court will not act as an armchair quarterback to the trial strategy of trial counsel, especially in light of the explicit instructions of their clients." The trial court determined that trial counsel's performance was reasonable considering all the circumstances

and that Lisa received a fair trial. Lisa's PCR motion was denied by the Lee County Circuit Court on March 20, 2019 and she perfected her appeal.

## STANDARD OF REVIEW

¶12. "A trial court's denial of a motion for post-conviction relief will not be reversed absent a finding that the trial court's decision was clearly erroneous." *Smith v. State*, 806 So. 2d 1148, 1150 (¶3) (Miss. Ct. App. 2002). "However, when issues of law are raised, the proper standard of review is de novo." *Brown v. State*, 731 So. 2d 595, 598 (¶6) (Miss. 1999).

## ANALYSIS

### I. Ineffective Assistance of Counsel

¶13. Lisa claimed that her counsel was ineffective as follows: (1) failing to object to the district attorney calling her husband, Sammy, as a witness at trial, and (2) for objecting to the State's attempt to instruct the jury on self-defense. In "extraordinary circumstances," the right to effective assistance of counsel may also be excepted from the Uniform Post-Conviction Collateral Relief Act's procedural bars." *See Chapman v. State*, 167 So. 3d 1170, 1174 (¶12) (Miss. 2015).

¶14. To be successful in a claim for ineffective assistance of counsel,

> [f]irst, the defendant must show that counsel's performance was deficient. This requires showing counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction or a death sentence resulted from a breakdown in the adversary process that renders the result unreliable.

9

*Strickland v. Washington*, 466 U.S. 668, 687 (1984). Both prongs of the *Strickland* test must be proved, or the claim of ineffective assistance of counsel fails. *Id*. As to the first prong, this Court has held that "the accused is not entitled to errorless counsel, and not counsel judged ineffective by hindsight. Each case is to be decided on the totality of the facts of the entire record." *Stringer v. State*, 454 So. 2d 468, 476 (Miss. 1984). "Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence . . . ." *Id*. at 477. "Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Wilcher v. State*, 863 So. 2d 776, 796 (¶30) (Miss. 2003) (citing *Stringer v. State*, 454 So. 2d 468, 477 (Miss. 1984)). In determining what falls into the category of trial strategy, this Court has held that "Counsel's choice of whether or not to file certain motions, call certain witnesses, ask certain questions, or make certain objections falls within the ambit of trial strategy." *Hill v. State*, 850 So. 2d 223, 226 (¶14) (Miss. Ct. App. 2003) (citing *Scott v. State*, 742 So. 2d 1190 (¶14) (Miss. Ct. App. 1999)). Further, "[a] strategic decision to pursue less than all plausible lines of defense will rarely, if ever, be deemed ineffective if counsel first adequately investigated the rejected alternative." *Cole v. State*, 666 So. 2d 767, 776 (Miss. 1995) (quoting *Washington v. Strickland*, 693 F. 2d 1243, 1253-54 (5th Cir. 1982)). Finally, the Mississippi Supreme Court held in *Brawner v. State*, 947 So. 2d 254, 264 (¶24) (Miss.

10

2006), that "[c]ounsel will not be deemed ineffective for following his client's wishes, so long as the client made an informed decision. A defendant may not block his lawyer's efforts and later claim the resulting performance was constitutionally deficient."

### A. Sammy's Testimony

¶15. Lisa alleges that her trial counsel was ineffective for failing to object to the district attorney calling her husband at the time, Sammy, as a witness at the original trial. Lisa testified at the evidentiary hearing that had she known that she could have prevented Sammy from testifying, she would have. She testified that she and Bauer had one conversation about Sammy testifying but it was never mentioned again. Lisa testified that "had I known that he would be used against me, I certainly would not have allowed him to take the witness stand."

¶16. Bauer testified at the evidentiary hearing that "It is my practice that my clients are in charge of their case . . . . It is their decision at every point, unless it is a tactical decision. He stated that he made Lisa aware that they could keep him from testifying and that they spoke about it specifically at the Lee County Jail extensively and on another occasion with Sammy present. Further, Bauer testified:

> Lisa, with my advisement decided that it would best for Sammy to testify. . . it was my tactical advice that we should let him testify early because Sammy was one of the few people that I believed would have good things to say about Lisa during the course of the trial, and I wanted those things to be said early. I didn't want them to be said after the State had torn Lisa down

When asked if he told Lisa that it was ultimately her decision whether Sammy testified, Bauer stated, "Yes." Bauer testified at length regarding all of the factors that played a role in having Sammy testify and he outlined those factors as follows: (1) he would have good

11

things to say about Lisa, (2) he was the only reliable witness other than Lisa who saw the shooting, (3) he could help prove their accident defense, as he was the owner of the gun and he was the last person to use the gun, (4) it was his practice to keep the gun unloaded in the house, and (5) he could testify as to Kirk's drug addiction, criminal history, and propensity to steal from him.

¶17. Finally, the decision to call or not call certain witnesses falls within the realm of trial strategy. Through his testimony at the evidentiary hearing, Bauer clearly and concisely laid out his reasoning and strategy for choosing to allow Sammy to testify at trial. In essence, Sammy helped to prove the defense of accident that Lisa testified to at the trial. Bauer believed that Sammy's testimony would give some credence that Lisa could reasonably think that the shotgun was unloaded. Because Lisa was a part of the decision making process throughout the trial, and it was ultimately her decision to have Sammy testify, this issue is without merit.

### B. Self-Defense Jury Instruction

¶18. Lisa alleged that her trial counsel was ineffective at the original trial for objecting to the State's attempt to insert the "not in necessary self-defense" language into the elements instruction. At the evidentiary hearing, Lisa testified that Bauer never explained anything about jury instructions. When asked specifically if Bauer ever explained the ramifications and likely results of claiming self-defense or accident, Lisa testified that Bauer "never went into any details of that." However, even at the evidentiary hearing, Lisa still maintained her position that she never intended to shoot Kirk.

12

¶19. Bauer testified at the evidentiary hearing that "the decision regarding how to move forward with the trial, as far as our defenses would go, was made by Lisa to rely on accident." Bauer testified:

> She and I discussed it thoroughly, and it's one of the few times in my legal career where I have come to a point where I virtually told a client, hey, you have to get on the stand and say these things in order for us to claim this. I did not go that far, but I got as close as I thought I could ethically get to telling her what needed to be said in order for us to claim [that] defense. Ms. Sandlin consistently told me that she never feared for her life and that she did not believe it was self-defense, It was an accident, she never intended to shoot her step-son and that she did not know that the gun was loaded. She just wanted to scare him away, which I believe.

When asked what his reasoning was for objecting to the self-defense language in the elements instructions, Bauer stated that "The decision had been made by Ms. Sandlin that self-defense was not the defense we were utilizing. It was going to be an accident, and solely an accidental defense." Bauer stated that he did everything in his power to convince Lisa that self-defense was the proper defense; however, "Lisa held stubbornly to the position that this was an accident" and Bauer quoted Lisa as saying, "I did not have to defend myself." Bauer testified that on one occasion, Lisa told him that Sammy never would have let Kirk do anything to hurt her. Finally, Bauer testified that he advised Lisa on the potential likely outcomes if she was successful on either the accidental defense or the self-defense defense. But Lisa insisted on pursuing accident only, and to the exclusion of self-defense.

¶20. Just like the decision to let Sammy to testify, Bauer testified that Lisa was the driver behind pursuing an accident defense to the exclusion of self-defense. The facts as laid out by Bauer indicated that Lisa made an informed decision to pursue the accident defense over

13

the advice of counsel and is now trying to claim that his representation is constitutionally deficient. The law should not sanction a second guessing of a jury verdict because a defense used by and authorized by a defendant proved ineffective. *See generally Brawner v. State*, 947 So. 2d 254 (Miss. 2006).

¶21. We will not reverse a trial court's decision to deny a motion for post-conviction relief absent a finding that the decision was clearly erroneous. Bauer testified as to the trial strategy utilized, the numerous conversations that he had with Lisa leading up to her trial, and that she understood and directed that defense. "[T]he trial judge, sitting in a bench trial as the trier of fact, has sole authority for determining credibility of the witnesses." *Johns v. State*, 926 So. 2d 188, 194 (¶29) (Miss. 2006). Given the testimony presented at the evidentiary hearing, Lisa does not overcome the first prong of the *Strickland* case in proving that counsel was deficient, and the trial court obviously found attorney Bauer's testimony to be credible and trustworthy. *Strickland*, 466 U.S. at 687. Therefore, we find no error in the trial court's decision to deny Lisa's motion for post-conviction relief.

## II. Cumulative Error

¶22. Lisa argues that the alleged cumulative errors denied her of her constitutional rights under the Fifth, Sixth, Eighth and Fourteenth amendments. "The cumulative error doctrine stems from the doctrine of harmless error . . . [, which] holds that individual errors, which are not reversible in themselves, may combine with other errors to make up reversible error, where the cumulative effect of all errors deprives the defendant of a fundamentally fair trial." *Harris v. State*, 970 So. 2d 151, 157 (¶24) (Miss. 2007) (quoting *Ross v. State*, 954 So. 2d

14

968, 1018 (Miss. 2007)). Because there were no errors by the trial court which would require reversal, this issue is without merit.

## CONCLUSION

¶23. After review, we do not find that the trial court's decision to deny Lisa's motion for post-conviction relief on the basis of ineffective assistance of counsel was clearly erroneous. Finding no error, the decision of the circuit court is affirmed.

¶24. **AFFIRMED.**

**BARNES, C.J., WILSON, P.J., GREENLEE, WESTBROOKS, McDONALD AND McCARTY, JJ., CONCUR. CARLTON, P.J., DISSENTS WITH SEPARATE WRITTEN OPINION.**

**CARLTON, P.J., DISSENTING:**

¶25. I respectfully dissent from the majority's opinion finding that Lisa failed to show that her trial counsel was ineffective. After reviewing the record, I find that Lisa met her burden of proving that her trial counsel's performance was deficient for failing to request jury instructions on the Castle Doctrine, self-defense, and imperfect self-defense, as well as for objecting to the State's attempts to instruct the jury on self-defense. *See Strickland v. Washington*, 466 U.S. 668, 687 (1984). Lisa also met her burden of proving that this deficiency prejudiced her defense. *Id*. As a result, I would reverse and remand for a new trial.

¶26. A defendant alleging ineffective assistance of counsel bears the burden of proving: "(1) [her] counsel's performance was deficient, and (2) this deficiency prejudiced [her] defense." *Walden v. State*, 270 So. 3d 1013, 1020 (¶25) (Miss. Ct. App. 2018); *Strickland*,

15

466 U.S. at 687. Lisa "must demonstrate that, but for the errors of trial counsel, there is a reasonable probability that [s]he would have received a different outcome in the trial." *Nix v. State*, 8 So. 3d 141, 145-46 (¶22) (Miss. 2009). Upon review, we determine whether a trial counsel's performance was both deficient and prejudicial by examining the totality of the circumstances." *Johnson v. State*, 196 So. 3d 973, 976 (¶11) (Miss. Ct. App. 2015) (internal quotation marks omitted).

¶27. The supreme court has explained that "[w]hen claiming ineffective assistance of trial counsel because of jury instructions, 'it is the duty of the appellant to demonstrate both error in failing to receive the instruction and the prejudice to the defense.'" *Havard v. State*, 928 So. 2d 771, 789 (¶28) (Miss. 2006) (quoting *Burnside v. State*, 882 So. 2d 212, 216 (¶22) (Miss. 2004)). We recognize that "[t]here is a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance and that the challenged action might be considered sound trial strategy." *Woods v. State*, 242 So. 3d 47, 55 (¶30) (Miss. 2018) (quoting *Giles v. State*, 187 So. 3d 116, 120 (¶12) (Miss. 2016)). The supreme court has clarified that "[t]rial counsel's decisions on whether or not to file certain motions, call witnesses, ask certain questions, or make certain objections fall within the ambit of trial strategy and cannot give rise to an ineffective assistance of counsel claim." *Johnson*, 196 So. 3d at 976 (¶11) (quoting *Carr v. State*, 873 So. 2d 991, 1003 (¶27) (Miss. 2004)) (other citation omitted).

¶28. At the trial, the transcript reflects that during the jury instruction conference, Lisa's trial counsel objected to the self-defense language in a proposed jury instruction, stating,

"There has been no evidence put on, or any attempt to show that there was some self-defense. I think it would be confusing to the jury to bring up self-defense at this point, when it has not happened during the testimony in the trial." The trial court agreed that no evidence of self-defense had been presented during the trial. The transcript from the evidentiary hearing on Lisa's PCR motion reflects that Lisa's trial counsel testified that he "guess[ed]" it was trial strategy to pursue the defense of accident, explaining that "I think that it would have been confusing for the jury to be presented with a defense [(self defense)] that we had not presented at trial."

¶29. However, the supreme court has held that "[a] criminal defendant has a right to assert alternative theories of defense, even inconsistent alternative theories." *Reddix v. State*, 731 So. 2d 591, 593 (¶9) (Miss. 1999); *see also Woods*, 242 So. 3d at 57 (¶39) ("A defendant is entitled to jury instructions on his theory of the case whenever there is evidence that would support a jury's finding on that theory.") (quoting *Thomas v. State*, 48 So. 3d 460, 469 (¶23) (Miss. 2010)).

¶30. After reviewing the record, I submit that the testimony and evidence presented at Lisa's trial supported a self-defense jury instruction. Lisa testified that on the evening of the shooting, she and Kirk engaged in a verbal altercation. Lisa stated that during the altercation, Kirk was aggressive toward her and spit in her face. Lisa clarified that Kirk was not physical with her and did not hit her, but she testified that during the altercation, he was verbally abusive and came toward her "aggressively." Lisa testified that she was afraid of Kirk "[b]ecause [she] didn't know how he was going to act when he was on drugs." Forensic

17

pathologist Dr. Amy McMaster testified that Kirk's toxicology report confirmed the presence of methamphetamine in Kirk's system on the evening of the shooting. Several witnesses testified that Kirk had exhibited aggressive behavior in the past. The testimony at trial also reflects that Lisa was standing in the kitchen door of her home when she shot Kirk.

¶31. Sammy, Lisa's husband, testified that on the evening of the shooting, Lisa told Kirk that she wanted him off her property. According to Sammy, Kirk "stood up and flexed his muscles, and said, Daddy, if you don't get her away from me, I'm going to kill her." Sammy testified that he did not think Lisa wanted to kill Kirk; rather, "[s]he wanted him to stay away." Sammy testified that Lisa wanted Sammy "to get a restraining order on [Kirk,]" but Sammy explained that "[he] couldn't do that [to] [his] son."

¶32. At the evidentiary hearing on Lisa's PCR motion, Lisa's trial counsel testified that "the decision regarding how to move forward with the trial, as far as our defenses would go, was made by Lisa to rely on accident." Trial counsel again stated that "[t]he decision had been made by [Lisa] that self-defense was not the defense we were utilizing. It was going to be an accident, and solely an accidental defense." However, the comment to Mississippi Rule of Professional Conduct 1.2 provides that although "[b]oth lawyer and client have authority and responsibility in the objectives and means of representation[,] . . . a lawyer is not required to pursue objectives or employ means simply because a client may wish that the lawyer do so." Miss. R. Prof. Conduct 1.2 cmt. The comment further states that "the lawyer should assume responsibility for technical and legal tactical issues." *Id*.

¶33. Based on the circumstances of this case, I find that the failure of Lisa's trial counsel

18

to request jury instructions on the Castle Doctrine, self-defense, and imperfect self-defense, as well as her trial counsel's objection to the State's attempts to instruct the jury on self-defense, prejudiced Lisa's defense and constituted ineffective assistance of counsel. Accordingly, I would reverse and remand for a new trial.