# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 1999-DR-01394-SCT

*CLYDE WENDELL SMITH*

*v.*

*STATE OF MISSISSIPPI*

| | |
|---|---|
| DATE OF JUDGMENT: | 7/1/1993 |
| TRIAL JUDGE: | HON. GRAY EVANS |
| COURT FROM WHICH APPEALED: | LEFLORE COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | PRO SE |
| | ALAN M. FREEDMAN |
| | C. JACKSON WILLIAMS |
| | OFFICE OF CAPITAL POST-CONVICTION COUNSEL |
| | BY: ROBERT M. RYAN |
| | WILLIAM J. CLAYTON |
| | LOUWLYNN VANZETTA WILLIAMS |
| ATTORNEYS FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: MARVIN L. WHITE, JR. |
| | JEFFREY A. KLINGFUSS |
| DISTRICT ATTORNEY: | FRANK CARLTON |
| NATURE OF THE CASE: | CIVIL - DEATH PENALTY - POST CONVICTION |
| DISPOSITION: | APPLICATION FOR LEAVE TO SEEK POST-CONVICTION RELIEF GRANTED IN PART AND DENIED IN PART - 05/20/2004 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**EN BANC.**

**COBB, PRESIDING JUSTICE, FOR THE COURT:**

¶1.     Clyde Wendell Smith (hereafter Smith) was convicted of the capital murder of Johnny B. Smith in the Leflore County Circuit Court in 1993.  Prior to that trial, Smith was allowed by the trial court to override the advice of his counsel,[1] and the trial court rescinded its earlier order of severance, thus allowing Smith and his brother, Jerome, to be tried jointly, in both the guilt phase and the sentencing phase.  Smith's conviction and sentence to death by lethal injection were affirmed by this Court in *Smith v. State*, 729 So.2d 1191 (Miss. 1998).  This Court denied his motion for rehearing on February 25, 1999, and the United States Supreme Court denied Smith's petition for writ of certiorari on June 24, 1999.  *Smith v. Mississippi*, 527 U.S. 1043, 119 S.Ct. 2410, 144 L.Ed.2d 808 (1999).  Smith's motion for rehearing was denied on August 23, 1999.  *Smith v. Mississippi*, 527 U.S. 1059, 120 S.Ct. 2410, 144 L.Ed.2d 830 (1999).

¶2.     Smith filed a skeletal pro se petition for post-conviction relief on August 23, 1999.  Thereafter, in accordance with *Jackson v. State*, 732 So.2d 187 (Miss. 1999), this Court remanded the post-conviction proceedings to the Leflore County Circuit Court for appointment of qualified counsel to represent Smith.  Counsel has since been appointed and has filed a supplemental application for post-conviction relief, subsequently amended to include an *Atkins* claim, which is presently before this Court.

## FACTS

¶3.     The factual background in this case was laid out in detail in the opinion in the direct appeal.  *See Smith v. State*, 729 So.2d at 1195-99.  This Court, in a 5-3-1 decision, concluded that there was evidence sufficient to support the verdict, and found no reversible error.  A review of the facts reveals that on the night of November 7, 1992, at approximately 9:00 p.m., Johnny B. Smith was killed in the liquor

---

[1] Trial counsel was also appellate counsel on direct appeal.

store he owned in Sidon, Mississippi. He was shot three times, and two of the wounds were fatal. Taken from the store were a cash register and an extra cash drawer. Also missing was Johnny Smith's handgun, which was either a .32 or .38 caliber weapon, and the projectiles recovered from his body and from the scene were consistent with those of a .38 caliber weapon. Fingerprints found on the counter were identified as matching those of Smith's co-defendant, his brother Jerome Smith.

¶4.     Testimony for the State at trial was given by more than a dozen witnesses, including two men who drove by the liquor store between 9:00 and 10:00 p.m. that night and saw a red and white car parked near the liquor store. Two Leflore County deputies (one being the victim's brother) testified that they were on patrol that night and, just before receiving a call about the shooting, they saw a red car parked near the liquor store, and two people sitting in the car, who slid down in their seats as the patrol car passed by. The victim's thirteen-year-old son, Kevin, was at his father's store just minutes before the robbery and murder, and testified that as he was leaving the store, two black men came by him, going toward the store, and one was wearing the cap recovered by the police outside the store after the murder. At trial, Kevin identified Smith and Jerome as the men he saw that night. Several witnesses placed the victim in his store, still alive shortly before 9:00 p.m. on the night of his murder.

¶5.     Carolyn Pearce testified that around 2:00 a.m. on the morning after the murder, she was with Smith and Jerome in a red and white car in Indianola, when they bought crack cocaine and Smith, who had many loose bills, talked about buying $300 or $400 more cocaine. Outside the presence of the jury, Pearce stated that both men raped her before putting her out of the car.

¶6.     A police officer for the town of Isola testified that he was on patrol when he spotted a red and white automobile leaving a service station around 3:00 a.m. He followed the car, noticed that it was weaving, stopped it, and then recognized Smith and Jerome. Because they seemed nervous, he talked with

3

them for a few minutes, and after allowing them to leave, the officer advised the Humphreys County Sheriff's Department to keep an eye out for the vehicle because the brothers were acting suspicious.

¶7.     Putting these details together, the officers later saw the vehicle, turned around to follow it, and subsequently chased the brothers into a field after they abandoned the vehicle on the side of the road. When the officers looked into the vehicle, they could see a sawed-off .410 shotgun on the back floorboard, and subsequently found a set of keys later identified as fitting the lock on the liquor store where the robbery and murder had earlier taken place.

¶8.     Smith and Jerome presented an alibi defense, with testimony not only from their sister, but also from Smith's girlfriend and the owner of the Isola Lounge.  None of them, however, presented evidence to conclusively prove that the Smith brothers could not have been in Sidon at approximately 9:00 p.m. when Johnny Smith was killed.  By noon the day following the murder the police had obtained warrants for Smith and Jerome, who were arrested and incarcerated in the Leflore County jail.

## ISSUES

¶9.     Smith's attorney raises eighteen issues in the petition for post-conviction relief and amendment thereto.  The issues before this Court today involve, either directly or within the context of ineffective counsel, the following:  (1) shackling during trial; (2) juror misconduct in both guilt and penalty phases; (3) failure to preserve *Batson* issues; (4) failure to fully present mitigation evidence at sentencing; (5) need to review death sentence in light of new evidence outside the record and co-defendant's life sentence; (6) exclusion of certain jurors; (7) no impeachment of material witness; (8) presence of sheriff in courtroom during trial proceedings; (9) allowing joint trial with co-defendant; (10) excusing of potential jurors after unrecorded bench conferences; (11) failure to object to jury instruction regarding aggravating and mitigating circumstances of equal weight; (12) prosecutor's improper closing argument in guilt phase and (13) in

4

penalty phase; (14) erroneous instruction re: aggravating and mitigating circumstances; (15) jury failure to find degree of Smith's personal culpability; (16) jury instruction did not inform of all three sentencing options; (17) cumulative error, and (18) vacating Smith's death penalty due to mental retardation.

¶10.    Smith's skeletal pro se petition raises five very general issues, each consisting of only one sentence, claiming:  ineffective assistance of counsel (1) at trial, (2) at sentencing and (3) on appeal; also (4) failure to provide unknown and unidentified possibly exculpatory material; and (5) "many other fact based claims" that cannot be investigated without assistance.  The first three fall within the eighteen raised by counsel and are combined there for discussion.  The other two are so vague and non-specific as to be meaningless.

¶11.    We conclude that the only claim which warrants post-conviction relief is the Atkins claim set forth in the amendment to the petition filed by counsel.  All other claims set forth in the pro se petition and counsel's petition are without merit and are denied.

## DISCUSSION

¶12.    The majority of the issues presented relate to claims of ineffective assistance of counsel.  Smith was represented at trial and on direct appeal by Wallace Stuckey and Whitman Mounger.  The standard for determining if a defendant received effective assistance of counsel is well settled.  "The benchmark for judging any claim of ineffectiveness [of counsel] must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Strickland v. Washington*, 466 U.S. 668, 686, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). A defendant must demonstrate that his counsel's performance was deficient *and* that the deficiency prejudiced the defense of the case. *Id*. at 687. "Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable." *Stringer v. State*, 454 So.2d 468, 477 (Miss. 1984), citing *Strickland v.*

*Washington*, 466 U.S. at 687.  The focus of the inquiry must be whether counsel's assistance was reasonable considering all the circumstances. *Id.*

> Judicial scrutiny of counsel's performance must be highly deferential.  (citation omitted)... A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time.  Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'

*Stringer*, 454 So.2d at 477, citing *Strickland*, 466 U.S. at 689.  Defense counsel is presumed competent.  *Washington v. State*, 620 So.2d 966 (Miss. 1993).

> Then, to determine the second prong of prejudice to the defense, the standard is "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  *Mohr v. State*, 584 So.2d 426, 430 (Miss.1991).  This means a "probability sufficient to undermine the confidence in the outcome." **Id.**  The question here is

>> whether there is a reasonable probability that, absent the errors, the sentencer--including an appellate court, to the extent it independently reweighs the evidence--would have concluded that the balance of the aggravating and mitigating circumstances did not warrant death.  *Strickland*, 466 U.S. at 695, 104 S.Ct. at 2068.

> There is no constitutional right then to errorless counsel.  *Cabello v. State*, 524 So.2d 313, 315 (Miss. 1988);  *Mohr v. State*, 584 So.2d 426, 430 (Miss. 1991) (right to effective counsel does not entitle defendant to have an attorney who makes no mistakes at trial; defendant just has right to have competent counsel).  If the post-conviction application fails on either of the *Strickland* prongs, the proceedings end. *Neal v. State*, 525 So.2d 1279, 1281 (Miss. 1987);  *Mohr v. State*, 584 So.2d 426 (Miss. 1991).

*Davis v. State*, 743 So.2d 326, 334 (Miss. 1999) (citing *Foster v. State*, 687 So.2d 1124, 1130 (Miss. 1996)).

¶13. Additionally, many of the claims raised in the present petition were previously raised at trial or in Smith's direct appeal. This Court has noted:

> Post-conviction relief is not granted upon facts and issues which could or should have been litigated at trial and on appeal. "The doctrine of res judicata shall apply to all issues, both factual and legal, decided at trial and on direct appeal." Miss. Code Ann. § 99-39- 21(3) (Supp. 1994). We must caution that other issues which were either presented through direct appeal or could have been presented on direct appeal or at trial are procedurally barred and cannot be relitigated under the guise of poor representation by counsel.

*Foster v. State*, 687 So.2d 1124, 1129 (Miss. 1996).

## I. WHETHER SMITH WAS IMPROPERLY SHACKLED DURING THE TRIAL AND HIS TRIAL COUNSEL WAS INEFFECTIVE FOR NOT OBJECTING TO THE SHACKLING.

¶14. Smith claims that his legs and arms were improperly shackled during the trial and that jurors could have been and were influenced by his appearance in handcuffs and leg shackles. He has submitted an affidavit from one of the trial jurors who states that he observed Smith wearing leg shackles during the courtroom proceedings. Smith also presents an affidavit from a social worker who states that another juror also said during an interview that she remembered that Smith had been shackled during the trial.

¶15. The second statement is not a juror's affidavit. It is a social worker's affidavit in which she recounts what a juror supposedly said during an interview with Smith's attorneys. The claims in the second affidavit are based on hearsay and can be discounted on that basis. The first affidavit is valid. However, that juror's only statement related to the shackles is that he observed Smith wearing shackles during the trial.

¶16. The direct claim that Smith was improperly shackled at trial could have been raised at the trial and again on direct appeal. That claim is therefore procedurally barred pursuant to Miss. Code Ann. § 99-39-21(2). Smith also claims that his attorneys at trial and on appeal were ineffective in failing to raise the issue at trial and on appeal.

¶17. Generally, a defendant has the right to appear before his jury free of shackles or handcuffs. ***Brown v. State***, 798 So.2d 481, 501 (Miss. 2001); ***Rush v. State***, 301 So.2d 297, 300 (Miss. 1974). However, where there is a risk of escape or the possibility of harm to other persons, restraint devices may be used in the judge's discretion. ***Id***.

¶18. Here, there is no reference to the shackles in the trial court record. The attorneys did not object at trial and did not raise the issue on appeal, but that does not require a finding that the attorneys were ineffective. Smith has presented no evidence that his defense suffered any negative consequence from the fact that he was restrained during the trial. The two jurors who remember the shackles make no statement that they were disturbed by Smith's presence in shackles. Smith was charged with a brutal capital murder. He had a history of violent felonies, having been previously convicted of kidnaping and two counts of aggravated assault. We find no ineffective assistance of counsel in the failure to object to Smith being shackled at trial where no juror has stated that the shackling affected the conviction or sentence in any respect.

## II. WHETHER THERE WAS JUROR MISCONDUCT IN BOTH THE GUILT AND SENTENCING PHASES.

¶19. Smith presents four claims of juror misconduct which we consider separately.

### A. *The jury considered matters outside the record*.

¶20. Smith claims that the jury may have been influenced by evidence of another crime which was not properly before the jury. Carolyn Pearce testified at the trial that Jerome and Smith were in a red and white car shortly after the robbery, that they assaulted her with a pistol and a knife, and that they had a large amount of loose cash with them, and talked about buying more cocaine. She had also claimed that Jerome and Smith had raped her in the assault, but the rape testimony was not presented to the jury. Smith claims

8

that the jury inappropriately considered the rape claim, but he cites no authority to support this claim. He has submitted an affidavit from juror Carolyn Mack, in which she mentions that during deliberations, "[i]t was stated by other jurors that Jerome Pete Smith had also committed rape in the past." The juror does not claim that the rape allegation influenced the jury's decision in any way. And, more specifically, she does not claim that the jury was prejudiced against Smith by the allegation that his brother, Jerome, had possibly committed a rape.

¶21. Smith also presents an affidavit from a social work intern who claims that another juror, Mary Ann Stanton, had stated during an interview that "at the time of her [Stanton's] deliberations as a juror in the trial and sentencing of Clyde Wendell Smith and his brother and co-defendant, Jerome Pete Smith, that they had raped a woman, and she considered this fact in her decision." As discussed previously, this is not a juror's affidavit. It is a social work intern's account of statements supposedly made by the juror. This is not a proper affidavit, and the Court will not consider it in the post-conviction proceedings. Miss. Code Ann. § 99-39-9(1)(e) allows the petitioner to present affidavits from witnesses who would testify at trial, not hearsay statements allegedly made by a juror to a third party.

¶22. Generally, a juror is not allowed to impeach his own verdict by testifying about motives or influences that affected the deliberations, although jurors may testify about misconduct in their presence or about outside influences on the jury panel. *Lewis v. State*, 725 So.2d 183, 190 (Miss. 1998), citing *Fairman v. State*, 513 So.2d 910, 915-16 (Miss. 1987). *See also* M.R.E. 606(b) (juror can only testify "on the question whether extraneous prejudicial information was improperly brought to the jury's attention or whether any outside influence was improperly brought to bear upon any juror").

¶23. In *Lewis*, this Court held that there must be more than the mere allegation of improper out of court evidence, stating that "there must be sufficient proof of an alleged outside influence." *Lewis,* 725 So.2d

9

at 190 (citing ***King v. State***, 580 So.2d 1182, 1187 (Miss. 1991); ***Williamson v. State***, 512 So.2d 868, 882 (Miss. 1987); ***Carter v. State***, 493 So.2d 327, 329 (Miss. 1986)). Further, the Court in ***Lewis*** held that the "mere possibility that [an improper] influence might have been used ... is not sufficient to justify setting aside this conviction." ***Id.***

¶24. Smith has failed to show any prejudicial jury misconduct here. The only valid affidavit states merely that some jurors had heard that Jerome Pete Smith, not Clyde Wendell Smith, had committed a rape in the past. There is no allegation that the jurors came to their decision based on a rape allegation against Jerome Smith.

        *B.*       *The jury improperly considered the possibility of parole.*

¶25. Smith submits three affidavits from jurors who state that they were concerned during the penalty deliberations that if they sentenced the defendants to life that they would get out on parole. He also submits a statement from the social work intern whose recitation of a fourth juror's statement as to parole eligibility is similar to that of the other three jurors.

¶26. Smith cites ***Williams v. State***, 445 So.2d 798, 813 (Miss. 1984) where this Court stated that "[r]eference to the possibility of parole should the defendant not be sentenced to die are wholly out of place at the sentencing phase of a capital murder trial." In ***Williams***, the Court found reversible error in the prosecutor's repeated questioning of a defense expert about the expert's understanding that a life sentence usually meant thirty years in prison. The Court in ***Williams*** found that the discussion of parole was improper but found that the error was reversible only in that the trial court also erred in several other respects (discussion of the defendant's right not to testify and discussion of the defendant's right to appeal at different levels). In sum, the parole consideration error was only reversible in conjunction with the other errors in the ***Williams*** case.

¶27. Smith, however, argues that *Williams* requires relief for him. The Court in *Williams* did state that parole consideration at a death penalty trial was improper. However, the Court has declined to extend the prohibition about parole considerations beyond the prosecutor's closing arguments, the jury instructions, or witness testimony. In *Wilcher v. State*, 697 So.2d 1087 (Miss. 1997), a question about parole eligibility arose during voir dire when a potential juror asked if life meant life with or without parole. This Court found no reversible error there. *See also Wiley v. State*, 691 So.2d 959 (Miss. 1997) (Supreme Court distinguished holding in *Williams* and found that jury was properly instructed and that there was no error in the discussion of parole during voir dire).

¶28. The present allegation is not that the jury was improperly instructed about parole eligibility or that the court or a witness or an attorney made any improper statement about parole during the trial. The claim is that the jurors, while in the jury room, on their own, considered whether the Smiths would be eligible for parole. Apparently the jurors did, in fact, consider parole possibilities. During its deliberations, the jury sent out a note which is not part of the record. The judge described the question as:

> the jury sent a note to me to this effect, that they were aware of the fact that Clyde Smith had four life -- was serving life without parole and their question was whether Jerome Smith would be eligible for parole . . . The Court answered it in these words 'Jerome Smith would be eligible to be considered for parole'.

¶29. This Court has not heretofore determined that a jury could not, on its own, decide that the severity of a crime required the finality of the death penalty. The Mississippi legislature did not amend Miss. Code Ann. § 97-3-21 to allow a jury in a capital murder case to return a verdict of life without parole until 1994, and then only as to "any case in which pre-trial, trial or re-sentencing proceedings take place after July 1, 1994." Prior to that date, at all times pertinent to Smith's crime (1992) , trial and sentencing (1993), the only options were life imprisonment or death. Because it would be natural for the jury to consider the

11

possible ramifications of a life sentence verdict, this case is distinguishable from **Williams,** which dealt with explicit discussion of parole during the penalty phase of the trial. That simply didn't happen here. The only allegation of impropriety is that the jurors, during their deliberations, discussed whether the Smiths might eventually be paroled if they were sentenced to life. In **Wilcher** and **Wiley**, the Court found that factually and legally correct statements as to parole eligibility during voir dire were not error. In the present case, we hold that the jurors were not prohibited from discussing among themselves whether parole was a possibility, since they were instructed correctly. There is no error here.

¶30.    Additionally, during closing argument, Smith's attorney informed the jury that Smith was already serving a life sentence without parole. The attorney stated:

> This man, Clyde, Sunday, the day before this trial started was serving four life sentences without parole, and I can tell you regardless of what you heard on T.V. about how people serve a year and a half for raping somebody on the average, or whatever statistics they come up with, I can tell you and the law will tell you and this Court will tell you, he will never see the outside of a prison cell until he dies in prison. Now that's before we got here. That's the case and it's still the case, and a sentence of life from you won't affect it. It won't lessen it, it won't override it, it won't take the place of it. Those sentences are there and he will serve that time and he never will get out. There's the difference between these two people right there.

He also argued at some length that life in prison without parole was the harsher punishment. It is clear that the defense chose to inform the jury about Smith's life sentences without parole. The jury knew that if Smith was sentenced to life he would never be paroled. Thus little stock should be put in the current affidavits that say that the jurors were concerned that Smith would be paroled one day. This sub-issue is without merit.

> C.    *The jury improperly considered the convictions and sentences of Jerome and Smith jointly and did not give separate consideration to each charge and each sentence.*

12

¶31. The allegation here is that the jury lumped the two defendants together and decided jointly that both were guilty and that both should be sentenced to die.[2] This issue is similar to that raised in Issue XV, infra, where the allegation is made that the attorneys were ineffective in failing to object to the lack of individualized verdicts.

¶32. Smith again submits affidavits from three jurors who stated generally that they decided the guilty verdict and sentencing verdict of both defendants with no individual consideration as to each defendant. Smith cites *McKoy v. North Carolina*, 494 U.S. 433, 110 S.Ct. 1227, 108 L.Ed.2d 369 (1990) (North Carolina's death penalty scheme unconstitutional because it required the jury to find an absence of the mitigating factors unanimously); *Woodson v. North Carolina*, 428 U.S. 280, 96 S.Ct. 2978, 49 L.Ed.2d 944 (1976) (North Carolina statute, which made a death sentence mandatory in the event that a defendant was convicted of capital murder, found unconstitutional); and *Gregg v. Georgia*, 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976) (Georgia's death penalty framework, with consideration of aggravating and mitigating factors, was not unconstitutional). However, Smith provides no pinpoint cites and it does not appear that those opinions support his case, since none of those cases dealt with multiple defendants or the possibility that the jury could have failed to give independent consideration to each defendant's guilt and punishment.

¶33. Regardless, this issue is without merit. As noted in the discussion of Issue XV, this issue was raised on direct appeal and is therefore barred. The jury was properly instructed that it had to consider each defendant's guilt separately. Jurors are presumed to follow instructions. *Puckett v. State*, 737 So.2d 322, 347 (Miss. 1999). The jury returned individualized verdicts which read separately "as to Clyde

_____

[2] Jerome's death sentence was reversed by this Court, and on remand he was sentenced to life without parole (see Issue V, infra.)

Wendell Smith" and "as to Jerome Pete Smith." Additionally, as discussed above, they sent out a note asking a question about each defendant's parole eligibility. That question indicates that they considered each defendant separately. There is no merit in the allegation that the jury failed to consider Clyde Smith's conviction and sentence separately from his brother's.

### D. The jury improperly considered extraneous religious matters.

¶34. Here, Smith submits affidavits from two jurors and the statement of a social work intern, all of which claim that the jury said a prayer after deciding its sentencing verdict but before the verdict was read in court. Smith claims that the jurors improperly sought religious guidance during their deliberations, but the affidavits and statement all say that the prayer was held after the deliberations were complete. Smith fails to show how the jury could have been improperly influenced, when the deliberations were over and the jurors had agreed on the death penalty for Smith and his brother.

¶35. Smith cites no Mississippi cases regarding the issue of prayer by the jurors. However, defense attorneys in capital cases often invoke the scriptures and quote Biblical references, and this Court has held that such references in closing arguments are not prohibited to either side. *Carr v. State*, 655 So.2d 824, 853 (Miss. 1995). *See also Berry v. State*, 703 So.2d 269, 281 (Miss. 1997). The jurors are not required to strip away any moral or theological beliefs when they enter the jury room. They are entitled to rely on all of their experiences so long as they follow the law. There is no error here.

### III. WHETHER TRIAL COUNSEL WAS INEFFECTIVE FOR FAILING TO PRESERVE ISSUES RELATED TO *BATSON v. KENTUCKY*.

¶36. Smith's jury was composed of nine white members and three black females. He claims that the jury selection process violated *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), and that his attorneys were ineffective in failing to preserve for the record all of the jury selection process.

14

Smith raised the *Batson* issue in his direct appeal. *Smith*, 729 So.2d at 1201-02. There, this Court found that three black jurors had served on Smith's jury, that the State still had peremptory challenges available when those three were placed on the jury, and that Smith had waived the issue by not objecting to the composition of the jury during the selection process. *Id.*

¶37. Smith asserts that his lawyers should have challenged the State's use of its peremptory strikes and were ineffective in failing to do so. However, counsel is presumed to be competent, and if counsel is reasonably effective in the defense of an accused, he or she meets constitutional standards, irrespective of the client's evaluation of his performance. *Johnson v. State*, 476 So. 2d 1195, 1204 (Miss. 1985). Jury selection is generally a matter of trial strategy, and an attorney's decision not to make a *Batson* challenge does not amount to ineffective assistance of counsel absent a showing of prejudice to the defendant. *See Burns v. State*, 813 So.2d 668, 676 (Miss. 2002). Smith simply has not shown any prejudice. For the first time, he asserts a theoretical and statistical claim, and quotes from general research done for the Capital Jury Project by Marla Sandys, Ph.D., regarding the decision-making process of capital jurors. Her research concluded that "[a] sentence of life was no more or no less likely with the presence of three or more African American women on the jury" finding that 50% resulted in a life sentence, and 50% resulted in a death sentence." However, after reviewing the composition of Smith's jury, she was led to conclude that "[i]n my opinion, had there been a single African American male on the jury, it is more likely than not that Mr. [Clyde Wendell] Smith would have received a sentence of life." This theoretical and statistical conjecture is simply not sufficient to show deficient performance resulting in prejudice.

¶38. Three African-Americans sat on Smith's jury. The defense attorneys could well have thought that the State had adequate race neutral reasons for the State's strikes and the defense attorneys could have based their decision not to make a *Batson* motion on their belief that such a motion would have been

15

without merit. There is no requirement that the defense make motions that the attorneys don't believe will succeed. This issue is without merit.

**IV.    WHETHER TRIAL COUNSEL WAS INEFFECTIVE BY FAILING TO ADEQUATELY INVESTIGATE, DEVELOP, AND PRESENT MITIGATION EVIDENCE AT THE SENTENCING PHASE.**

¶39.    The defense offered only one witness during the sentencing phase. Smith's mother testified about his difficult childhood and about family problems primarily related to Smith's father who had mental problems and did not play a significant role in raising his children. Smith now claims that his attorneys were ineffective in failing to present additional mitigation witnesses at the sentencing phase. He submits affidavits from three of his sisters, and one brother. These potential witnesses generally state that Smith has some redeeming qualities and that they would have been willing to testify at Smith's trial if they had been contacted by Smith's attorneys prior to trial. They also tell of a "chaotic" home life, a mother who worked long hours, and an abusive father. They tell of Smith being a "very active child" who was protective of his brother, Jerome. They tell of his problems with the police and of an older brother, Sampson, a convicted felon who was a bad influence on Smith.

¶40.    Because some of the information was not helpful to the defense, it is possible that the decision not to call any witnesses was defensible trial strategy. Smith had previously been convicted of kidnaping and two counts of aggravated assault. There are indications in the record that he had been in other trouble with the law. Given his criminal background, his history of drug and alcohol abuse, and his history of involvement in violence, the defense arguably could have feared that calling some of these witnesses would do more harm than good. Also, Smith was advised of his right to testify in mitigation, but he declined. Additionally, trial counsel sought to have Smith examined for mental competency for use at trial and in defense, but to no avail, because Smith did not want such an examination or such evidence to be used.

16

¶41. This Court has held that the "failure to present a case in mitigation during the sentencing phase of a capital trial is not, per se, ineffective assistance of counsel." *Williams v. State*, 722 So.2d 447, 450 (Miss. 1998), citing *Williams v. Cain*, 125 F.3d 269, 277 (5th Cir. 1997). However, in *Woodward v. State*, 635 So.2d 805, 810 (Miss. 1993), we found that the defendant's attorneys were ineffective during the sentencing phase due to failure to present all available mitigating evidence, resulting in prejudice to Woodward.

¶42. In *Leatherwood v. State*, 473 So.2d 964, 970 (Miss. 1985), this Court considered a death penalty case in which the defense had called only four witnesses in mitigation although others were apparently available. The Court found:

> Although complaints of uncalled witnesses are not favored because presentation of testimony is a matter of trial strategy, *Boyd v. Estelle*, 661 F.2d 388, 390 (5th Cir. 1981), the failure to call available witnesses on critical issues is a factor to be considered under the totality of the circumstances. . . . In view of the importance of mitigating evidence in the sentencing phase it is difficult to understand why favorable, willing witnesses who could be discovered by questioning the defendant would not be called. If it were within the financial ability of the defendant to arrange for the appearance of a representative group of them, this would have a strong bearing on whether trial counsel provided effective assistance. Of course, counsel's overall performance must be considered.

473 So.2d at 970.

¶43. In *Holly v. State*, 716 So.2d 979 (Miss. 1998), the defendant's attorneys called his mother in the penalty phase and no other witnesses. This Court held that the post-conviction relief petitioner had not shown a reasonable probability that additional evidence in mitigation would have produced a different result. However, this Court has granted post-conviction relief in similar cases when the petitioner's attorneys did not present much, if any, evidence in mitigation in the sentencing phase. *See Burns v. State*, 813 So.2d 668, 678-79 (Miss. 2001). Additionally, the United States Supreme Court in *Wiggins v.*

17

*Smith,* 539 U.S. 510, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003), held that ineffective assistance of counsel may be found when the attorneys perform an inadequate investigation of petitioner's life and fail to call expert witnesses to testify regarding his hard background.

¶44.    Also within this issue, Smith asserts that trial counsel could have presented evidence of his limited intelligence and mental capacity. As noted above, counsel filed a motion to obtain mental evaluations of Smith done for presentation at trial. But due to the wishes of Smith, and for strategic reasons, this was not done.

¶45.    Smith presents for review with his petition, uncertified school records from the Humphreys County school system as well as the East Columbia school system where he attended seventh grade. There is no indication that he was in special education classes, and in 1985-86, the last year he is shown to have attended (in the 8th grade) his yearly averages (on a scale of 70-100 being passing) were: math, 62; English, 80; history, 64; science, 72 and physical education, 96. Also included is an Affidavit of Julie Kriegler, Ph.D. who earned her degree in clinical psychology from Michigan State University in 1988, who was asked by current counsel to determine what investigation should be undertaken to identify and develop mitigation evidence for Smith. She did not meet with Smith, but rather based her determination on Smith's prior criminal proceedings and preliminary information about his life history, including affidavits by family members, unspecified professionals and an investigator familiar with Smith's history, plus the sentencing phase testimony from Smith's trial, this Court's opinion on direct appeal, and additional information regarding family history and mental health background provided by counsel. She stated that the "limited educational records available for review at this time indicate that Mr. Smith's IQ has been found in the borderline mentally retarded range. This finding combined with his poor school performance support a hypothesis of the presence of neuro-cognitive or mental impairments in Mr. Smith." However there is no

18

mention of even borderline mental retardation elsewhere in the record. An evaluation of Smith conducted by the Mississippi Department of Youth Services at the Columbia Training School when he was committed for the first time, at 13 years of age, indicates an I.Q. of 75 as determined by the Peabody Picture Vocabulary Test. He was committed to Columbia for the second time at age 14, but the record does not contain any additional evaluation data except a new letter from Myron J. Horn, Ph.D., clinical psychologist, which prescribes verbatim the same counseling goals as were prescribed by Dr. Horn when Smith was first committed thirteen months earlier. When he was discharged from Columbia the second time, in March of 1985, after repeating the seventh grade there, his grades were: life sciences, 75; English, 75; world geography, 80; and remedial math, 90.

¶46. Some of this would be irrelevant, or inadmissible, and each witness would be subjected to cross-examination. Most of the proposed testimony in the affidavits submitted with the petition also deals with Smith's childhood including his physical problems, his father's abusiveness, his father's alcoholism, and the less-than-stellar living conditions in which he was raised. Smith's mother testified to much of that during the sentencing phase. Because much of this evidence (the abusive father, the father's alcoholism, etc.) was already before the jury, not only would much of the information in the affidavits be duplicative, but also there would be a risk that additional negative information might be elicited. Finally, even if the evidence provided at trial is held to be insufficient, there is no showing by a reasonable probability that the outcome would have been different with additional evidence. There is a minimal showing of deficient performance and no assertion of prejudice. This issue is without merit.

V. WHETHER THE DEATH SENTENCE SHOULD BE REVIEWED IN LIGHT OF NEW EVIDENCE OUTSIDE THE RECORD, AND THE FACT THAT PETITIONER'S CO-DEFENDANT WAS SENTENCED TO LIFE IMPRISONMENT.

19

¶47.    Smith makes a proportionality argument that his death penalty should be overturned in light of his co-defendant's life sentence. Jerome and Clyde Smith were tried jointly. The State's theory was that Jerome had been the triggerman. His fingerprints were found inside the liquor store. Jerome was seen in the possession of the pistol on the day of the murder. Both brothers were convicted of capital murder and both were initially sentenced to death. Jerome's death sentence was reversed by this Court on the basis of an improper jury instruction regarding Jerome's eligibility for parole if he had been sentenced to life imprisonment. *Smith v. State*, 724 So.2d 280 (Miss. 1998). On remand for a new sentencing hearing, Jerome was sentenced to life without parole. Smith now argues that his death sentence is disproportionate and that his sentence should be commuted to life.

¶48.    Smith cites *Reddix v. State*, 547 So.2d 792 (Miss. 1989), and *Bullock v. State*, 525 So.2d 764 (Miss. 1987). In both of those cases, this Court found that the defendants were not the actual killers and that the death penalties were disproportionate. Additionally, in both those cases the co-defendant actual killers did not receive the death penalty. The Court distinguished *Reddix* and *Bullock* in the direct appeal. The Court also noted that death penalties have been upheld in situations where a codefendant was guilty of the actual killing in *Stringer v. State*, 454 So.2d 468 (Miss. 1984); *Leatherwood v. State*, 435 So.2d 645 (Miss. 1983); and in *Ballenger v. State*, 667 So.2d 1242 (Miss. 1995) (Ballenger has since been granted post-conviction relief and her sentence has since been reduced on other grounds).

¶49.    This issue was raised on direct appeal, and we discussed the evidence that Smith was not the triggerman. We determined that his culpability was not lessened because arguably he was the ringleader who proposed and planned the crime; there was no evidence that he suffered from any mental illness or retardation; and his criminal history of at least three prior convictions for felonies involving violence, including kidnapping and aggravated assault, prevented a finding of disproportionality. However, at that

20

time, though Jerome's conviction and death penalty had been reversed by this Court, he was still subject to the death penalty. There was evidence that Smith planned the crime. He told Henry Bryant about the possibility of robbing a small store in a small town with no law enforcement around. Smith had stated that he needed money. There is evidence in the record from which it could reasonably be determined that he was the leader in the decision to rob the Sidon liquor store. He knew that Jerome had a pistol. He himself had a knife. The finding that Smith contemplated that lethal force would be used is certainly justified in the record.

¶50. This Court determined on direct appeal that the sentence was not disproportionate even though it appeared that Jerome was the actual triggerman. Nothing has changed that. This issue is without merit.

## VI. WHETHER TRIAL COUNSEL WAS INEFFECTIVE FOR FAILING TO OBJECT TO THE EXCLUSION OF CERTAIN JURORS.

¶51. Smith claims that the trial judge erred in excluding two jurors from the venire and that his attorneys were ineffective in not objecting to their exclusion. Miss. Code Ann. § 13-5-1 (Rev. 2002) lists the qualifications for potential jurors. One of those qualifications is that the juror must be able to read and write. During voir dire, the trial judge asked the venire if there was anyone who was unable to read and write. Juror Hartfield stated that she could read "a little bit but not good." The trial judge excused her at that point.

¶52. Smith also asserts that his attorneys were ineffective in failing to object to the exclusion of Juror Taylor. During voir dire, it was evident that Taylor did not understand the proceedings. The trial judge tried a number of different ways to explain the importance of Taylor's willingness and ability to state whether she understood the ramifications of the death penalty and whether she could apply the written

21

instructions to the evidence presented. None seemed to help. The judge then stated to the attorneys, outside the hearing of Taylor:

> Do y'all think in a case where the stakes are as high as these that we need [juror Taylor] on the jury who is not going to, from what I've been able to determine, understand what anybody is talking about and who will likely be swayed by others. You take a chance either way.

Taylor was excused without objection by either side.

¶53. Smith now asserts that his attorneys at trial should have objected to the exclusion of Taylor. In his direct appeal, Smith raised the exclusion of potential juror Taylor, and this Court found that:

> the record shows that it is highly probable that Taylor would not have been able to adequately follow the trial court's instructions and would have probably been a disruptive force had she sat on the final jury panel. Taylor even stated that she did not believe she would be able to listen to the evidence and the jury instructions and make a determination of guilt or innocence. Taylor later stated that she did not understand exactly why she was there or what the death penalty is. Her answers to the judge's and the attorneys' questions were confusing and she stated on several occasions that being there scared her. When all the individual voir dire of Taylor is taken together, the fact that trial court asked her if she understood what mitigating and aggravating circumstances are is of little consequence. The trial court was clearly justified in excusing Taylor.

*Smith*, 729 So.2d at 1199-1200. Regarding juror Taylor, this issue has been raised at trial and on direct appeal and has been found to be without merit. It is therefore barred in the post-conviction proceedings. Miss. Code Ann. § 99-39-21(2). If this Court has found that the trial court committed no error in excusing Taylor, then the attorneys could not have been ineffective in failing to object to Taylor's dismissal.

¶54. The analysis with regard to juror Hartfield is similar. In response to the trial judge's question if there was any juror who was unable to read and write, Hartfield stated that she could only read "a little bit." She was excused without objection. Smith now claims that his attorneys were ineffective in failing to object to her dismissal. As with Taylor, this was a juror with apparent minimal literacy. The statute requires that jurors be able to read and write. Capital cases are complex with complicated instructions. The trial judge

22

did not err in excusing a juror who admitted that she could barely read and write. It therefore follows that the attorneys were not ineffective in failing to object to her dismissal. Furthermore, the attorneys' decisions with regard to the final composition of the jury are generally determined to be matters of trial strategy. The defense could well have thought that it was not in Smith's best interest to have a juror who could not understand the complexities of Smith's case. There was no ineffective assistance in the failure to object to the excusal of jurors Hartfield and Taylor.

VII. **WHETHER TRIAL COUNSEL WAS INEFFECTIVE FOR FAILING TO IMPEACH A MATERIAL WITNESS WITH ALLEGED PRIOR INCONSISTENT STATEMENT.**

¶55. The State called Eddwantya Epps who testified at trial that she saw two black men at the liquor store. She stated that the one she saw outside the store was a light skinned black man and that the man who came from inside the store appeared to be taller than the one who stayed outside. Smith claims that his attorneys were ineffective in failing to cross-examine Epps about her testimony. Epps was, however, cross-examined by one of Jerome's attorneys. Smith's attorney apparently saw no need for further examination and asked no questions. Smith now claims that both he and Jerome are dark skinned and that the attorneys should have questioned Epps about that. That fact is not in the appellate record. The jury was capable of making its own determination whether Smith and Jerome, who were sitting at the defendants' table, matched the description offered by Epps, if the jury thought that was important. There is no real need for cross-examination on that point. If asked on cross-examination, Epps might have modified her statement or amplified her testimony on direct. She had already said that the man outside, who supposedly was light skinned, had his head down. The attorneys could have rightfully feared that her testimony on cross might not have been as beneficial to the defense as what she had already said on direct.

23

This appears to be a matter of trial strategy. There is no deficient performance in the failure to ask Epps any additional questions on cross-examination.

¶56.	Smith also claims that the attorneys should have questioned Epps about an allegedly inconsistent statement she gave to law enforcement officers after the crime. In that statement, Epps stated that she was five feet, six inches tall and that the man waiting outside the store was a little taller than she was and that the man who came out from inside the store was a little taller than the man who had remained outside. In his petition, Smith claims that the attorneys were ineffective in not impeaching Epps with that out of court statement. Smith claims that he is five feet, eight inches tall and that his brother is six feet tall. It appears that Epps' statement that she, at 5'6", was a little taller than the man outside the store (Smith at 5'8") and that he was a little shorter than the man inside the store (Jerome at 6') is reasonably consistent. There is little room for impeachment in the relative heights of the defendants and the witness, thus no ineffective assistance of counsel occurred in that regard.

## VIII.	WHETHER TRIAL COUNSEL WAS INEFFECTIVE FOR NOT OBJECTING TO THE PRESENCE OF THE LEFLORE COUNTY SHERIFF DURING THE TRIAL PROCEEDINGS.

¶57.	Smith claims that Leflore County Sheriff Ricky Banks was present as the courtroom bailiff during most of the trial, and Banks was thus able to tailor his testimony after hearing the testimony of the other witnesses. Banks' testimony constitutes six pages of the appellate record, and the bulk of his testimony concerned the search for the Smith brothers after they fled from law enforcement off the highway north of Belzoni. Smith now argues that his trial attorneys were ineffective in failing to object to Sheriff Banks' presence in the courtroom when he was scheduled to testify later in the proceedings.

¶58.	Smith cites no authority to support this claim. He claims that Banks was present during the trial but he makes no references to the record in support of that allegation. He notes several instances in Banks'

24

testimony which he claims were prejudicial to his case where Banks was able to bolster problems with the State's case by explaining why another man was initially arrested, why Clyde was not initially picked in the photo lineup and by giving a credible reason for the failure to find the alleged third person involved in the crime. Even if Smith had shown that Banks was indeed acting as a bailiff and present through most of the trial, which is not clear from the record, there is no showing of any prejudice to Smith.

¶59.    All of the alleged bolstering of the State's case occurred during cross-examination by the defense. The defense wanted to get into the fact that Smith had not been picked in the photo lineup and that another man had initially been a suspect. All of that was fertile for cross-examination. But it is expected that the witness would try to explain his testimony about those matters. The allegation of prejudice to Smith by Banks' presence in the courtroom simply is not borne out.

¶60.    In *Graham v. State*, 195 Miss. 291, 15 So. 2d 478 (1943), this Court pointed out that it was within the sound discretion of the trial judge to permit the sheriff to remain in the courtroom during the trial of the case, although he was a witness. *See also* M.R.E. 615. This Court has also held that a case will not be reversed because of the ruling of the trial judge on such question unless it manifestly appears that there has been an abuse of discretion. *Fondren v. State*, 253 Miss. 241, 262, 175 So. 2d 628, 637 (1965). Further, in *Davis v. State*, 406 So. 2d 795, 801 (Miss. 1981), under circumstances and allegations similar to the present case, this Court found that Davis's only contention was that the sheriff "must have heard the other witnesses testify; and therefore, we suppose, in some fashion not pointed out, either altered his testimony or by his very presence prejudiced the jury." *Id* at 802. We held that was not abuse of discretion on the part of the trial judge to permit the sheriff to remain in the courtroom. Unlike this case, Davis's attorney had objected to the sheriff's presence. There is no merit to this issue.

25

## IX. WHETHER TRIAL COUNSEL WAS INEFFECTIVE FOR ALLOWING THE PETITIONER TO BE TRIED JOINTLY WITH CO-DEFENDANT JEROME PETE SMITH AT BOTH THE GUILT AND PENALTY PHASES.

¶61. Clyde Smith and his brother Jerome were jointly indicted for the capital murder of Johnny B. Smith, and attorneys for both defendants initially sought a severance. The trial judge initially granted the motion for a severance, but the Smith brothers decided they wanted to be tried together and declined separate trials. The trial judge held a pretrial hearing on the severance issue, and both defendants stated on the record that they understood the risks of being tried together and both stated that they desired a joint trial. The Smiths were tried together, and both were convicted of capital murder.

¶62. Clyde Smith now claims that his attorneys were ineffective in allowing the trial to go forward without a severance. In his direct appeal, Smith alleged that the trial court erred in not granting a severance sua sponte. This Court discussed the severance issue at length and determined that neither Miss. Code Ann. § 99-15-47 (which provides for separate trials in capital cases if the defendants request a severance) nor the Uniform Rules of Circuit and County Court Practice require separate trials for jointly-tried defendants. *Smith*, 729 So.2d at 1203-04. In the direct appeal, the Court found that "[b]ecause Clyde requested a joint trial, he essentially voluntarily made a knowing and informed waiver of his right to a separate trial, and he cannot now complain that his request was granted." *Id.* at 1204.

¶63. Because this issue was substantially addressed on direct appeal, it is barred in the post-conviction proceedings. Miss. Code Ann. § 99-39-21(2). Res judicata prevents the relitigation of this claim. Notwithstanding the procedural bar, this issue is without merit. The attorneys filed motions for severance, and the trial court granted them. The Smith brothers themselves insisted on being tried together. That decision was made in part by Smith over his attorneys' objections. The attorneys counseled Smith against

26

being tried with his brother. They made their objections known on the record. Despite their counsel, Smith chose to go to trial with his brother even after being informed that his case might be prejudiced by evidence against Jerome. Moreover, Smith has pointed to no specific prejudice, rather simply makes the bald, unsupported assertion that "[t]he petitioner here was clearly prejudiced at both the guilt and the sentencing phases." Under the circumstances, the attorneys' performance on the severance issue was not deficient.

## X. WHETHER TRIAL COUNSEL WAS INEFFECTIVE FOR NOT OBJECTING TO THE JUDGE'S DECISION TO EXCUSE POTENTIAL JURORS AFTER UNRECORDED BENCH CONFERENCES.

¶64.    During voir dire, on several occasions, jurors were summoned to the bench where they conversed with the judge in unrecorded bench conferences. Smith argues that his constitutional rights were violated in that the entire capital murder trial was not recorded.  In the direct appeal, this Court found that the defense had offered no objection to the voir dire process and failed to insure that a complete record of the trial was made. The Court determined that the issues related to the unrecorded bench conferences was not properly preserved. *Smith*, 729 So.2d at 1200, 1201.

¶65.    In the post-conviction proceedings, Smith claims that his attorneys were ineffective in failing to see that the conferences were recorded. He cites three instances in the record where there was a pause in the proceedings during which the judge apparently discussed jurors' reasons for being unable to serve. Those conversations were not recorded.

¶66.    In the first situation noted by Smith, the trial judge during his voir dire of the venire, asked if there were any students in the pool who would be taking final exams the week of the trial.  Three jurors approached the bench and, according to the record, were heard outside the hearing of the jury, counsel, and the court reporter.  Two of those jurors, who apparently had final exams that week, were excused.

27

¶67.    In the second instance, the trial judge asked if any of the jurors had heard anything about the crime and whether those who had heard about it could still listen to the evidence and be fair to all parties. A juror stated that he knew about the case, and he stated that he did not think he could be fair. He was asked to approach the bench. The record states that when the juror approached the bench, "counsel approached the bench out of the hearing of the jury." After the conference, the trial judge noted on the record that the juror was the postmaster of Sidon, where the crime occurred, that the juror knew the family of the victim, that he knew about the crime and that he could not be fair. That juror was also excused without objection by the defense.

¶68.    The third juror to be excused after an unrecorded bench conference was the officer in charge of the maximum security unit at the Mississippi State Penitentiary. The defense attorney noted that the prison official was "familiar with at least one of the defendants." The trial judge stated that the juror had claimed a legal exemption to service and had been excused. The record is silent as to details of the juror's exemption.

¶69.    The general rule is that all matters in capital murder cases should be recorded by the court reporter, including all bench conferences. In *Suan v. State*, 511 So.2d 144, 147 (Miss. 1987) an objection was made to references to the defendant's "getting in trouble" and a bench conference was held on that objection. This Court said "because this is not the first time we have confronted this sort of situation [failure to transcribe off-the-record proceedings] we direct without equivocation that court reporters should *never* fail to preserve for record at-the-bench or chambers conferences following objections...." (emphasis in original). We went further and said "[t]he **trial judge** has the responsibility to enforce this directive."(emphasis added). In *Suan* we reversed the conviction, not on the failure to make a record of the bench conference but rather on the erroneous ruling of the trial court resulting from the conference. In

28

*Davis v. State*, 684 So.2d 643, 650 (Miss. 1996), no recording was made of the jury selection process and Davis did not object either before or after he participated in that process. This Court applied the same admonition regarding the judge's responsibility, but went on to note that it was the appellant's burden to furnish the record, and he could not afterward complain if no record was made. We also found that if any error did occur, it was harmless. *Id.* at 651. In *Burns v. State*, 813 So.2d 668 (Miss. 2001), the Court considered a similar situation in which some twenty-four conferences were held in the court reporter's absence in a death penalty trial. The Court found that the petitioner's counsel was not ineffective even though there was no objection to the absence of the court reporter at those bench conferences. *Id.* at 674-75. *See also* *Randall v. State*, 806 So. 2d 185, 216-17 (Miss. 2002); *Simmons v. State*, 805 So. 2d 452, 506 (Miss. 2002); *Thorson v. State*, 653 So.2d 876, 895 (Miss. 1994); *Doby v. State*, 557 So.2d 533, 536 (Miss. 1990).

¶70.     Notwithstanding these recent decisions which seem to back away from the pronouncement in *Suan* that "the court reporter should never fail to preserve for record at-the-bench or chambers conferences" and "the trial judge is responsible to enforce this directive", we reiterate that it is essential that the judges and reporters fulfill this obligation. This is true regardless of whether these conferences are for argument following objections, or for any other reason. This is especially true in death penalty cases. Clearly, the bench conferences in the present case should have been recorded. However, in order to prevail on the ineffective assistance of counsel claim under *Strickland*, Smith must show not only that his attorneys' conduct was deficient but also that his defense was prejudiced by the deficiency. Even if the attorneys were negligent in failing to see that the voir dire bench conferences were recorded, there is no showing of prejudice to Smith. One juror was a law enforcement officer who worked at Parchman and who knew one of the defendants through his work there. Another of the excused jurors was the postmaster in Sidon

29

who knew the victim's family and had heard all about the case and could not be fair. It is not logical that the defense would want either of those excused citizens to serve on the jury. Additionally, the attorneys knew the gist of the bench conferences even though those conferences were not recorded. The reasons for the excusal of those jurors was clearly in the record.

¶71. Regarding the two students who were excused due to their final exams during the week of the trial, again there is no reason to conclude there was prejudice to the defense. The context of the bench conference is fairly clear even if the conference was not recorded. The trial judge asked if any jurors had final exams. Two claimed that they did and were eventually excused.

¶72. We find no ineffective assistance of counsel in the failure to insure that all bench conferences were recorded. The petitioner has not shown that any prejudice resulted from the failure to object to the lack of a record of the excusal of the four jurors at issue here.

### XI. WHETHER TRIAL COUNSEL WAS INEFFECTIVE FOR FAILING TO MAKE AN OBJECTION TO THE INSTRUCTION THAT DEATH COULD BE IMPOSED IF AGGRAVATING AND MITIGATING CIRCUMSTANCES WERE OF EQUAL WEIGHT.

¶73. Smith makes the same argument that was made on direct appeal, that the trial court erroneously instructed the jury regarding how to weigh the aggravating and mitigating circumstances, couching it here in terms of ineffective assistance of counsel. He claims that his attorneys should have objected to the instruction S-1 on aggravating and mitigating circumstances, which stated as follows:

> If you find from the evidence that one or more of the preceding elements of mitigation exists, then you must consider whether it (or they) outweigh(s) or overcome(s) the aggravating circumstance(s) you previously found. In the event that you find that the mitigating circumstance(s) do not outweigh or overcome the aggravating circumstance(s), you may impose the death sentence. Should you find that the mitigating circumstance(s) outweigh or overcome the aggravating circumstance(s), you shall not impose the death sentence.

Smith again argues that this language improperly created a presumption in favor of death. As the direct claim that the instruction was improper was found to be without merit, there can be no claim that the attorneys were ineffective in failing to object to what was an acceptable instruction.

## XII.   WHETHER TRIAL COUNSEL WAS INEFFECTIVE FOR FAILING TO OBJECT TO IMPROPER PROSECUTORIAL STATEMENTS DURING CLOSING ARGUMENT AT THE GUILT PHASE.

¶74.   During closing argument in the guilt phase, the defense attorneys argued that the jury should not convict based on circumstantial evidence. In his rebuttal, the prosecutor compared the case to that of Ted Bundy who, the prosecutor claimed, had been convicted on circumstantial evidence. Smith now claims that his attorneys were ineffective in failing to object to that statement.

¶75.   The defense also argued that the Smiths could not possibly have killed the victim in Sidon at the time the crime allegedly occurred when they had been seen by their witnesses in Isola approximately an hour or forty-five minutes later. In his closing argument, the prosecutor argued that from his own experience, a person could easily drive the distance from the crime scene to Isola in forty-five minutes. The petitioner alleges that his attorneys were ineffective in failing to object to that statement as there was no proof in the record about the distances involved.

¶76.   As a general rule, prosecutors are to be given wide latitude in making their closing arguments. *Wiley v. State*, 691 So.2d 959, 965 (Miss. 1997) citing *Jimpson v. State*, 532 So.2d 985, 991 (Miss. 1988); *Johnson v. State*, 477 So.2d 196, 209 (Miss. 1985)); *Shook v. State*, 552 So.2d 841, 851 (Miss. 1989). With that latitude in mind, the closing argument must be considered in context, considering the circumstances of the case. *Id.* Citing *Ballenger v. State*, 667 So.2d 1242, 1270 (Miss. 1995); *Davis v. State*, 660 So.2d 1228, 1248 (Miss. 1995).

31

¶77.    Again, these issues were substantially raised in the direct appeal and were found to be without merit. *Smith*, 749 So.2d at 1214-15. In the direct appeal, this Court discussed the merits of those claims even though the defense attorneys failed to object during the closing argument. The Court found that the prosecutor's statements were not improper and that reversal was not warranted. The prosecutor did not compare Smith to Ted Bundy or argue that Smith should receive the death penalty like Ted Bundy. He merely stated that circumstantial evidence alone could be sufficient to support a murder conviction, as it had been in Bundy's case. As to the statement as to the mileage between Sidon and Isola, the Court found that argument was within the latitude of permissible closing argument. *Id.*

¶78.    These issues were raised in the direct appeal and were found to be without merit. They are therefore barred here. Post-conviction relief is not warranted on these claims of ineffective assistance of counsel in the failure to object to the prosecutor's closing argument in the guilt phase. Notwithstanding the procedural bar, the comments were within the wide allowable latitude granted in an attorney's closing argument.

### XIII.    WHETHER TRIAL COUNSEL WAS INEFFECTIVE FOR FAILING TO OBJECT TO IMPROPER PROSECUTORIAL STATEMENTS DURING CLOSING ARGUMENT AT THE PENALTY PHASE.

¶79.    Smith claims that the prosecutor improperly argued during the penalty phase that the death sentence was important to the victim's relatives and that the attorneys were ineffective in failing to object to the argument. Smith erroneously claims that victim impact evidence to the jury is not admissible in Mississippi, citing *Mack v. State*, 650 So.2d 1289, 1325 (Miss. 1994). The type of evidence proscribed in *Mack* is simply not what was put before the jury in the present case. This Court found on direct appeal that the argument made was within the permissible latitude given to prosecutors in closing argument, and further, that it was not preserved for appeal. *Smith*, 749 So.2d at 1225. As that issue has been heard by this

Court on direct appeal and found to be without merit, the post-conviction claim on that statement is barred by res judicata. Miss. Code Ann. § 99-39-21(2). Smith provides nothing new for this Court to consider.

¶80.    Smith also claims that the prosecutor incorrectly stated the law on the aggravating factors during the penalty phase. In his closing argument, the assistant district attorney discussed the required findings that the defendant actually killed the victim, intended that the killing take place, or have contemplated that deadly force would be used. He stated that the jury had already made a finding as to at least one of those factors by returning its verdict of guilty on the capital murder charge. Actually, by its verdict, the jury had found, pursuant to Instruction C-3, that the defendants "either individually or acting in concert with one another or others, did unlawfully, wilfully and feloniously kill and murder Johnny B. Smith, a human being, at a time when Jerome Pete Smith was engaged in the commission of the crime of Armed Robbery . . . ." Technically, they had not found that Clyde Smith had actually killed, intended the killing, or contemplated that lethal force would be employed. However, the jury was correctly instructed that they had to find that Clyde Smith actually killed, intended the killing, or contemplated that the deadly weapon would be used. The jury found in the affirmative on all three.[3] It is presumed that the jury followed the instructions and decided that those criteria were met.

¶81.    It appears that the prosecutor simply mi-spoke here. Later in his argument, the assistant district attorney stated that the jury had already made the finding that the murder was committed in the commission of an armed robbery and that aggravating factor had already been established and decided by the jury.

---

[3] The jury's finding that Clyde killed Johnny B. Smith is somewhat problematic. The State postulated that Jerome was the trigger man and that Clyde had remained outside the store. There is, however, ample support for a finding that Clyde contemplated that the deadly weapon would be used. According to Henry Bryant, Clyde had discussed robbing a store in a small town. Clyde knew that Jerome had the pistol. Clyde himself had a hunting knife of some sort.

33

He was correct on that point, but he mistakenly applied that same analysis to the question about whether the defendant actually killed, intended that the killing happen, or contemplated the use of a deadly weapon.

¶82.    It is also possible that the defense attorneys made a decision not to emphasize the question about whether each defendant actually killed the victim but rather chose to focus on the mitigating factors in the penalty phase, which would have been an acceptable strategy.  In sum, there is no prejudicially deficient conduct in the failure to object to this portion of the State's closing argument.

¶83.    Smith also claims that the prosecutor improperly discussed Smith's prior crimes which constituted the basis for one of the State's aggravating factors.  Both Jerome and Smith had been convicted of two counts of aggravated assault, and Smith had also been convicted of kidnaping.  In his closing argument, Jerome's attorney argued that one of the aggravated assault convictions was not that serious in that the Smiths had assaulted a street person with brass knuckles.  In response, the assistant district attorney stated that "[t]his is not a pair of brass knuckles, some street person.  I tried the case and it wasn't a street person."

¶84.    Smith claims that the argument was based on facts outside the record and that his attorneys should have objected.  Perhaps they should have objected.  Those facts were not in the record.  But the prosecutor's argument here was in response to the defense's claim that the crime somehow wasn't so bad because it involved a street person.  Additionally, this was a fairly inconsequential remark, taking only a few seconds of the many minutes spent in closing argument.  In that same context , Smith argues that the prosecutor improperly argued that the murder here was especially heinous even though the circuit judge had determined that this was not a suitable case for the use of the "especially heinous, atrocious or cruel" aggravating circumstance.  In his closing argument, the prosecutor discussed the sequence of shots that resulted in Johnny Smith's death.  He argued that the victim had been shot twice and then "as he turned to

34

flee for his life, it was ended by a bullet in the back. No, this is a bad murder." This argument was within the acceptable bounds of closing argument and did not violate the "heinous, atrocious, or cruel" proscription. The argument was a fairly brief description of the three shots including some speculation on the prosecutor's part as to the order of the shots. He concluded with the statement that "this is a bad murder." This was within the latitude allowed in closing arguments.

## XIV. WHETHER THE TRIAL JUDGE ERRONEOUSLY INSTRUCTED THE JURY THAT DEATH COULD BE IMPOSED IF AGGRAVATING AND MITIGATING CIRCUMSTANCES WERE OF EQUAL WEIGHT.

¶85. The jury instruction in question here is discussed in Issue XV, infra, in the context of ineffectiveness of counsel. Smith asserts that the instruction was improper in that it improperly created a presumption in favor of death, in that a death sentence would result if the jurors found the aggravating and mitigating factors to be equal. This same issue was raised in the direct appeal and was rejected there. *Smith*, 729 So.2d at 1225-26. This Court found that this issue had been addressed in *Conner v. State*, 632 So.2d 1239 (Miss. 1993) and in *Doss v. State*, 709 So.2d 369 (Miss. 1997). In those cases, we found that the instruction was not improper and did not create a presumption in favor of the death penalty. This Court in Smith's direct appeal held that "[t]he sentencing instruction complained of in the case at bar does not create a presumption of death nor does it require the sentencing jury to return a verdict of death if mitigating and aggravating factors are equipoise." 729 So.2d at 1226. As this issue has been addressed in the direct appeal, it is barred in the post-conviction proceedings. It also fails on the merits under *Smith* and *Conner*.

## XV. WHETHER TRIAL COUNSEL WAS INEFFECTIVE FOR NOT OBJECTING WHEN THE JURY FAILED TO MAKE AN INDIVIDUALIZED FINDING OF THE DEGREE OF SMITH'S PERSONAL CULPABILITY FOR THE HOMICIDE.

¶86.    In the sentencing phase, in accordance with *Enmund v. Florida*, 458 U.S. 782, 102 S.Ct. 3368, 73 L.Ed.2d 1140 (1982), the jury was instructed to consider whether the defendants had actually killed the victim, had intended that the killing take place, or that the defendants contemplated that lethal force would be employed. The jury found in the affirmative on all three questions on both the Smith brothers and returned separate verdicts on each of them. The jury's verdict as to Clyde Smith stated:

> We, the Jury, as to Clyde Wendell Smith, unanimously find from the evidence beyond a reasonable doubt that the following facts existed at the time of the commission of the capital murder:
> 1). That the *defendants* actually killed Johnny Smith
> 2). That the *defendants* intended the killing of Johnny Smith take place
> 3). That the *defendants* contemplated that lethal force would be employed.

¶87.    Smith argues that the use of the plural "defendants" instead of "defendant" indicates that the jury considered the two defendants together and did not individually contemplate whether Clyde Smith actually killed the victim, intended the killing or contemplated the use of deadly force. He claims that his attorneys were ineffective in not insuring that the jury form was proper and in not objecting to the use of "defendants". The State argues that the precursory language, in which the jury clearly stated that this verdict related to Clyde Wendell Smith alone, and not to both defendants together, clearly shows that the jury did treat the questions separately for the two defendants. Additionally, the jury returned separate verdicts with each clearly stating to which defendant it referred. Additionally, the jury sent out a note during the deliberations in which the jury noted that Clyde Smith was already serving four life without parole sentences and asked if Jerome would be eligible for parole. The note clearly infers that the jury did in fact deliberate each defendant's sentence separately.

36

¶88.    It is somewhat problematic that the jury found that Smith actually killed Johnny Smith.  The State's theory, based on testimony that the taller, thinner man went in the store and that Jerome's fingerprint was found inside, was that Jerome was the gunman and that Smith had kept watch outside.

¶89.    However, this exact issue was discussed by this Court in the direct appeal.  There, the Court found that:

> The plural "Defendants" was used in S-1 because one instruction was submitted for both defendants.  The jury when writing the separate verdicts for Clyde and Jerome copied the wording as it was written in the instruction.  This does not mean that the jury did not make an individualized finding as to each defendant.  What it does show is that the jury determined that each of the three factors applied equally to both Clyde and Jerome.  The jury clearly intended these factors to apply to Clyde as it prefaced this section of its verdict with the words 'as to Clyde Wendell Smith.

*Smith*, 729 So.2d at 1217.  The Court found the claim that the verdict form was defective to be without merit.  As this claim has been raised and rejected by this Court in the direct appeal, it is barred from consideration in the post-conviction relief action.  Smith raises nothing new, and the claim still is without merit.

## XVI.    WHETHER TRIAL COUNSEL WAS INEFFECTIVE FOR NOT REQUESTING AN AMENDMENT TO THE SENTENCING INSTRUCTIONS TO INFORM THE JURY OF THEIR OPTION TO FIND THAT THE JURY IS UNABLE TO AGREE UNANIMOUSLY ON PUNISHMENT.

¶90.    At the sentencing phase, the jury was instructed that it could return a verdict of death or life without parole.  Smith complained on direct appeal that the trial court erred in refusing to discharge the jury and sentence Smith to life imprisonment pursuant to Miss. Code Ann. § 99-19-103.  This Court found that the trial judge properly determined that, at the time the defense moved to discharge the jury and impose a sentence of life imprisonment (after only three hours and fifteen minutes of deliberation) it was reasonable

37

to let them continue deliberations. Approximately one hour later, the jury returned verdicts of death for both Smith brothers.

¶91.    Smith also argues that "[c]apital juries are generally given three options for their sentences -- death, life, or a separate option '[w]e the jury are unable to agree unanimously on punishment'", citing no authority but ***Jenkins v. State***, 607 So. 2d 1171, 1180 (Miss. 1992). A careful review of ***Jenkins*** reveals no such holding. On direct appeal, this Court rejected his argument, finding that Smith did not ask for an amendment allowing the third option, and thus it was barred from review. Further, we noted on the merits that the argument that the jury should be given the third option overlooks the statutory duty imposed on the trial court by Section 99-19-103 for the court to dismiss the jury after a reasonable period of deliberation and impose a life sentence on the defendant, ***Smith I***, quoting ***King v. State***, 421 So. 2d 1009, 1018 (1982) (overruled on other grounds). *See also* ***Howard v. State***, 853 So. 2d 781, 791-93 (Miss. 2003); ***Brooks v. State***, 748 So. 2d 736, 745 (Miss. 1999); and ***Blue v. State***, 674 So. 2d 1184 (Miss. 1996) (also overruled on other grounds). This issue has been presented and decided and cannot be relitigated under a claim of ineffective counsel. Since the underlying claim was held to be procedurally barred and lacking in merit, there is no showing of deficient performance.

## XVII.  CUMULATIVE EFFECT.

¶92.    Smith argues that this Court should grant his petition for post-conviction collateral relief or, alternatively, his application for leave to proceed in the trial court because the cumulative effect of the alleged errors requires relief even though the alleged errors by themselves may not require relief. According to Smith: "The violations set forth above should be examined for their cumulative effect both as to the fairness of the trial (Fourteenth Amendment) and also as to the arbitrariness of capital sentencing (Eighth Amendment)." Miss. Code Ann. § 99-39-21(3) (Supp. 2003) provides: "The doctrine of res judicata

38

shall apply to all issues, both factual and legal, decided at trial and on direct appeal." On Smith's direct appeal, this Court decided: "[T]he errors in this case, if any, do not have such cumulative effect as to require reversal." *Smith v. State*, 729 So. 2d at 1226. Therefore, Smith's cumulative effect argument is procedurally barred as res judicata. Even if Smith's cumulative effect argument was not already adjudged, it is still without merit because the cumulative errors, if any, do not require relief.

**XVIII.** **WHETHER THE SENTENCE OF DEATH MUST BE VACATED BECAUSE SMITH IS MENTALLY RETARDED.**

¶93.    In *Atkins v. Virginia*, 536 U. S. 304, 321, 122 S. Ct. 2242, 2252, 153 L. Ed. 2d 335 (2002), the United States Supreme Court concluded that death is not suitable punishment for mentally retarded criminals, and on June 19, 2003, Smith's counsel timely filed an amendment to the Petition for Post Conviction Relief then pending before this Court, in order to "crystallize the claim that Smith is retarded and should not be executed." The amendment asked this Court to vacate the death sentence, or in the alternative to remand to the trial court for an evidentiary hearing on the issue of mental retardation. The State correctly points out that Smith waited almost a year after the *Atkins* decision, some ten months after the State's response and some seven months after his rebuttal brief, to raise the mental retardation issue and asserts that this was done for no other purpose than delay. However, it was filed one day before the one year statute of limitations under Miss. Code Ann. § 99-39-5(2) expired, and due to the gravity of the retardation issue, we have granted permission to file this amendment of issue XVIII to the pending claims.

¶94.    Smith's amendment incorporated by reference the arguments which have been thoroughly discussed in Issue IV, supra, in the context of ineffective assistance of counsel in presenting mitigation evidence at the sentencing phase. Smith has offered nothing new here, except to speak in terms of mental

retardation in light of *Atkins*. The underlying data is the same. Nothing new has been added in the form of affidavits, examinations, or other potential evidence of mental retardation.

¶95. On direct appeal, based on that mitigation evidence presented at the sentencing phase, this Court held: "[T]here is no evidence that Clyde suffered from any mental illness or retardation." *Smith v. State*, 729 So.2d at 1220. Subsequently, the United States Supreme Court held that mentally retarded criminals could not be put to death, and left to the states "the task of developing appropriate ways to enforce the constitutional restriction upon [their] execution of sentences." *Atkins v. Virginia*, 536 U.S. at 317. To that end, this Court today has set forth, in *Chase v. State*, No. 2003-DR-01355-SCT (Miss. 2004), the tests, standards, and procedures to be followed in determining the issue of mental retardation.

¶96. Notwithstanding the dearth of evidence which is before this Court regarding Smith's claim of mental retardation, we determine that under *Atkins* and *Chase*, we cannot constitutionally deny him the opportunity to present the issue of his possible mental retardation to the trial court. It is at the trial court that all the arguments presented by the State as well as those of Smith shall be heard and be weighed in accord with *Chase*, and a final determination made as to whether Smith is mentally retarded and, thus, ineligible for the death penalty.

## CONCLUSION

¶97. After careful consideration of Smith's application, we grant Smith leave to proceed in the Leflore County Circuit Court on the sole issue of his alleged mental retardation, consistent with the requirements of *Atkins* and *Chase v. State*. All other claims in his petition for post-conviction relief are denied.

¶98. **APPLICATION FOR LEAVE TO SEEK POST-CONVICTION RELIEF GRANTED IN PART AND DENIED IN PART.**

**SMITH, C.J., WALLER, P.J., EASLEY, CARLSON, GRAVES AND DICKINSON, JJ., CONCUR. RANDOLPH, J., CONCURS IN RESULT ONLY. DIAZ, J., NOT PARTICIPATING.**